363 F.3d 897
 UNITED STATES of America, Plaintiff-Appellee,
v.
BLAINE COUNTY, MONTANA; Don K. Swenson, in his official capacity as a member of the Blaine County Board of Commissioners; Arthur Kleinjan, in his official capacity as a member of the Blaine County Board of Commissioners; Victor J. Miller, in his official capacity as a member of the Blaine County Board of Commissioners; Sandra Boardman, in her official capacity as Clerk and Recorder and Superintendent of Elections for Blaine County, Montana, Defendants-Appellants,
v.
Joseph F. McConnell; Franklin R. Perez; Candace D. De Celles; Cheryl Sears; Wesley D. Cochran; Linda M. Buck; Donald L. Knife; Daniel Kinsey; Fort Belknap Community Council, Plaintiff-Intervenors-Appellees.
 No. 02-35691.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted November 4, 2003.
 Filed April 7, 2004.
 
 COPYRIGHT MATERIAL OMITTED J. Scott Detamore, Lakewood, Colorado, for the appellants.
 Lisa Wilson Edwards, United States Department of Justice, Washington, D.C., for the appellee.
 Appeal from the United States District Court for the District of Montana; Philip M. Pro, District Judge, Presiding. D.C. No. CV-99-00122-PMP.
 Before: WARDLAW, GOULD, and PAEZ, Circuit Judges.
 PAEZ, Circuit Judge:
 
 
 1
 Section 2 of the Voting Rights Act prohibits any voting procedure that results in a denial of the right to vote. 42 U.S.C. § 1973. The United States brought this section 2 action against Blaine County alleging that the County's at-large voting system for electing members to the County Commission prevents American Indians from participating equally in the County's political process. The district court determined that section 2 was a constitutional exercise of Congress's powers under the Fourteenth and Fifteenth Amendments, and that Blaine County's at-large voting system violated section 2. In this appeal, Blaine County challenges both of those rulings.[1] We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 I.
 
 2
 Blaine County, located in north central Montana, is vast and sparsely populated. Its 7,009 residents are spread out over 4,638 square miles, which places the County in the top 5 percent of counties nationwide in terms of size. American Indians constitute 45.2 percent of the population and 38.8 percent of the voting age population, while whites make up 52.6 percent of the population and 59.4 percent of the voting age population. The American Indian population is geographically concentrated with 80 percent of the County's American Indians residing on the Fort Belknap Reservation. Despite their geographic concentration, no American Indian was ever elected to the Blaine County Commission under the at-large voting system.
 
 
 3
 That system worked as follows. The Blaine County Commission consists of three commissioners, each of whom must reside in one of three different residential districts. Each commissioner is elected by a majority vote of the entire county, not just by voters in the commissioner's residential district. The commissioners serve six-year staggered terms, such that each even-numbered year one commissioner stands for election.
 
 
 4
 The United States brought this action under section 2 and section 12(d) of the Voting Rights Act of 1965 challenging the County's at-large voting system. The United States sought a declaration that the existing at-large voting system violates section 2. The United States also sought an injunction to prevent the County from using at-large voting in future elections and to require the County to submit a new districting plan for the district court's approval.
 
 
 5
 The County moved for summary judgment on the ground that section 2 was unconstitutional because it exceeded the scope of Congress's powers to enforce the Fourteenth and Fifteenth Amendments. The district court ruled that section 2 did not exceed Congress's power and denied the motion. See United States v. Blaine County, 157 F.Supp.2d 1145 (D.Mont. 2001).
 
 
 6
 The case then proceeded to a court trial. In its post-trial Findings of Fact and Conclusions of Law and Order, the district court determined that Blaine County's system of staggered at-large elections for County Commissioner violated section 2. The court found that American Indian voters were sufficiently geographically compact and politically cohesive to elect a County Commissioner of their choice, but that Blaine County's white residents voted as a bloc to prevent American Indians from electing their preferred candidates. It then analyzed the totality of the local circumstances, and held that there was (1) a history of official discrimination against American Indians, (2) racially polarized voting, (3) voting procedures that enhanced the opportunities for discrimination against American Indians, (4) depressed socio-economic conditions for American Indians, and (5) a tenuous justification for the at-large voting system. Accordingly, the district court held that the totality of the circumstances weighed in favor of a section 2 violation.
 
 
 7
 The district court declared that the at-large voting system in Blaine County violated section 2, and enjoined the use of such an election system in the future. It also ordered the County to file an election plan that would remedy the section 2 violation. The district court subsequently adopted the County's proposed remedial plan, which provides for three single-member districts.[2] Blaine County does not appeal the remedy adopted by the district court. However, the County does appeal the district court's ruling that section 2 is constitutional and declaration that Blaine County's at-large voting scheme violated section 2.
 
 II.
 
 8
 As originally enacted in the Voting Rights Act of 1965 ("VRA"), section 2 merely restated the prohibition contained in the Fifteenth Amendment.[3] The VRA's most sweeping provision was section 5, which required "covered" jurisdictions with a history of voting discrimination[4] to preclear any change in voting practices or procedures with the United States Department of Justice. 42 U.S.C. § 1973c (1965). The 1965 Act also banned literacy tests in covered jurisdictions, and permitted the federal government to appoint federal registrars and election observers. Shortly after the VRA's enactment, the Supreme Court held in South Carolina v. Katzenbach that Congress constitutionally enacted section 5, the limited ban on literacy tests, and the appointment of federal monitors pursuant to its power under the Fifteenth Amendment. 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).
 
 
 9
 The VRA was first amended in 1970 when Congress made the ban on literacy tests nationwide for a five-year period. Although the Supreme Court had held in Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), that literacy tests were not unconstitutional per se, it upheld Congress's power to enact the five-year nationwide ban on literacy tests. Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). Congress again amended the VRA in 1975, making the nationwide literacy test ban permanent and extending the VRA's protections to language minorities.
 
 
 10
 During the 1970s, voting rights lawsuits increasingly relied on section 2 to remedy voting discrimination. In a series of cases, the Supreme Court and lower courts interpreted section 2 to require plaintiffs to show under the totality of the circumstances that the challenged system operated "to cancel out or minimize the voting strength of racial groups." White v. Regester, 412 U.S. 755, 765, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); see also Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973).
 
 
 11
 However, in 1980, the Court held in City of Mobile v. Bolden that Congress intended section 2 to regulate only conduct prohibited by the Fifteenth Amendment. 446 U.S. 55, 60-61, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Because the Fifteenth Amendment only prohibited intentional discrimination, a violation of section 2 required a showing that the challenged procedure was adopted with the intent to discriminate. Id. at 62, 100 S.Ct. 1490. That same day, however, the Supreme Court held in City of Rome v. United States that section 5's "ban on electoral changes that are discriminatory in effect is an appropriate method of promoting the purposes of the Fifteenth Amendment, even if it is assumed that § 1 of the Amendment prohibits only intentional discrimination in voting." 446 U.S. 156, 177, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). Thus, although the Court interpreted section 2 of the VRA to prohibit only purposeful discrimination, the Court recognized Congress's power to enact legislation that prevented voting procedures that had discriminatory results.
 
 
 12
 In response to Bolden and pursuant to its Fourteenth and Fifteenth Amendment enforcement powers, Congress amended section 2 to clarify that it was a results test. S.Rep. No. 97-417, at 15-16, 39 (1982), U.S.Code Cong. & Admin.News at 177, 192-93. Section 2, as amended by the 1982 Voting Rights Act, provides:
 
 
 13
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973(b), as provided in subsection (b) of this section.
 
 
 14
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 15
 42 U.S.C. § 1973.
 
 
 16
 The Supreme Court applied section 2 to multimember districts in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In that case, the Court held that when plaintiffs challenge at-large voting schemes under section 2, they must prove at a minimum that "a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group." Id. at 49, 106 S.Ct. 2752. Broken down, this test has three requirements, known as the "Gingles factors": (1) compactness; (2) cohesive minority voting; and (3) a bloc voting majority that can usually defeat the minority-preferred candidate. Id. at 50-51, 106 S.Ct. 2752.
 
 
 17
 If the plaintiff establishes these three factors, the court then must consider whether under the totality of circumstances the at-large voting system operates to prevent the minority group from participating equally in the political process and electing representatives of its choice. Id. at 44-46, 106 S.Ct. 2752. Gingles cited a non-exhaustive list of factors discussed in the Senate Report on the 1982 Amendments that courts should consider in assessing the totality of the circumstances:
 
 
 18
 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
 
 
 19
 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
 
 
 20
 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
 
 
 21
 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
 
 
 22
 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
 
 
 23
 6. whether political campaigns have been characterized by overt or subtle racial appeals;
 
 
 24
 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
 
 
 25
 Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
 
 
 26
 whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
 
 
 27
 whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
 
 
 28
 Id. at 36-37, 106 S.Ct. 2752 (quoting S.Rep. No. 97-417 at 28-29, U.S.Code Cong. & Admin.News at 205-07).
 
 
 29
 The most important Senate factors in a section 2 challenge to multimember districts are factors 2 (the extent to which elections are racially polarized) and 7 (the extent to which minorities have been elected). Id. at 51 n. 15, 106 S.Ct. 2752. The Senate Report's "list of typical factors is neither comprehensive nor exclusive" and "there is no requirement that a particular number of factors be proved, or that a majority of them point one way or the other." Id. at 45, 106 S.Ct. 2752. Rather, the ultimate "question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." Id. (internal citations omitted). With this history in mind, we turn to the constitutionality of section 2.
 
 III.
 
 30
 The County contends that Congress exceeded its enforcement powers under the Fourteenth and Fifteenth Amendments when it enacted the 1982 amendments to the VRA. We disagree.
 
 A.
 
 31
 To begin with, Blaine County does not dispute that the Supreme Court summarily affirmed section 2's constitutionality in Mississippi Republican Executive Committee v. Brooks, 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984), affirming Jordan v. Winter, 604 F.Supp. 807, 811 (N.D.Miss.1984) (3-judge district court). Although the County concedes that the Supreme Court summarily disposed of the same constitutional challenge that the County raises here,[5] it argues that this summary affirmance is not binding precedent for a federal appellate court.
 
 
 32
 This contention ignores the well-established rule that the Supreme Court's summary affirmances bind lower courts, unless subsequent developments suggest otherwise. Hicks v. Miranda, 422 U.S. 332, 344-45, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). The County suggests that summary dispositions have less precedential value than opinions. Although this is true in the sense that the Supreme Court is more willing to reconsider its own summary dispositions than it is to revisit its prior opinions, this principle does not release the lower courts from the binding effect of summary affirmances.[6] As the Court itself has instructed, "inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise." Miranda, 422 U.S. at 344, 95 S.Ct. 2281.
 
 
 33
 There have been no doctrinal developments that suggest we should ignore the Supreme Court's summary affirmance of section 2's constitutionality. While it is true that the Supreme Court has, in a series of recent cases, adopted a congruence-and-proportionality limitation on Congressional authority, this line of authority strengthens the case for section 2's constitutionality. Indeed, in the Supreme Court's congruence-and-proportionality opinions, the VRA stands out as the prime example of a congruent and proportionate response to well documented violations of the Fourteenth and Fifteenth Amendments. Most tellingly, when the Supreme Court first announced the congruence-and-proportionality doctrine in City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), it twice pointed to the VRA as the model for appropriate prophylactic legislation. Id. at 518, 525-26, 117 S.Ct. 2157. The Court's subsequent congruence-and-proportionality cases have continued to rely on the Voting Rights Act as the baseline for congruent and proportionate legislation. See Nevada v. Hibbs, 538 U.S. 721, 123 S.Ct. 1972, 1982, 155 L.Ed.2d 953 (2003) (highlighting the pattern of state constitutional violations that supported Congress's enactment of the VRA); Bd. of Trs. v. Garrett, 531 U.S. 356, 373-74, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (holding that "[t]he contrast ... is stark" between the evidence supporting the VRA's enactment and the insufficient evidence of state discrimination against the disabled); United States v. Morrison, 529 U.S. 598, 626, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (pointing to the VRA as legislation that appropriately targeted state constitutional violations, rather than discrimination by non-state actors); Fla. Prepaid v. Coll. Sav. Bank, 527 U.S. 627, 638, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (comparing the lack of evidence of state patent infringements with the "undisputed record of racial discrimination confronting Congress in the voting rights cases"). In sum, "the Court [has] continued to acknowledge the necessity of using strong remedial and preventive measures to respond to the widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination." Boerne, 521 U.S. at 526, 117 S.Ct. 2157. Thus, the congruence-and-proportionality cases support, not undermine, the Supreme Court's summary affirmance of section 2's constitutionality in Mississippi Republican Executive Committee, of which we remain bound.
 
 B.
 
 34
 Even if we were free to ignore the Supreme Court's summary affirmance, we would join all of the other "lower courts [that] have unanimously affirmed [section 2's] constitutionality." Bush v. Vera, 517 U.S. 952, 991, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (O'Connor, J., concurring).[7] Blaine County, however, offers two different reasons for why section 2 lacks congruence and proportionality. It argues that there is no widespread evidence of purposeful voting discrimination that would justify nationwide application of section 2. It also contends that section 2's results test is impermissible because the Constitution only prohibits intentional discrimination. We consider each argument in turn.
 
 
 1. Nationwide Application
 
 
 35
 The sweeping preclearance requirements of section 5 of the VRA only apply to jurisdictions with a recent history of using voting tests and devices to deny the right to vote. See Katzenbach, 383 U.S. at 328-331, 86 S.Ct. 803. The Supreme Court has looked favorably upon section 5's limited geographic scope in its congruence-and-proportionality cases. See City of Boerne, 521 U.S. at 533, 117 S.Ct. 2157. In light of section 5's limited geographic scope, the County contends that Congress exceeded its constitutional power by not placing similar geographic limitations on section 2 of the VRA and by failing to document a nationwide pattern of purposeful voting discrimination that would justify nationwide application of section 2. We disagree for several reasons.
 
 
 36
 First, legislation enacted under § 5 of the Fourteenth Amendment need not have geographic restrictions. City of Boerne, 521 U.S. at 533, 117 S.Ct. 2157 ("This is not to say, of course, that § 5 legislation requires termination dates, geographic restrictions or egregious predicates."). Such limitations only "tend to ensure" proportionality when Congress "pervasively prohibits constitutional state action." Id.
 
 
 37
 Unlike section 5 of the VRA, section 2 does not engage in such a pervasive prohibition of constitutional state conduct. The two sections of the VRA are dramatically different in scope. Section 5 is an extraordinary measure, which requires covered jurisdictions to submit every change in their voting procedures to the Department of Justice for preclearance. Section 5 thus places the burden of proof on the state or locality, not on the party challenging the voting procedure. Katzenbach, 383 U.S. at 328, 86 S.Ct. 803. Because section 5 imposes such a significant burden on state and local governments, Congress had reason to limit its application to jurisdictions with a recent history of pervasive voting discrimination.
 
 
 38
 Section 2 is a far more modest remedy. The burden of proof is on the plaintiff, not the state or locality. This burden is significant; Congress heard testimony that section 2 cases are some of the most difficult to litigate because plaintiffs must usually present the testimony of a wide variety of witnesses — political scientists, historians, local politicians, lay witnesses — and sift through records going back more than a century.[8] In contrast to section 5, section 2's results test makes no assumptions about a history of discrimination. Plaintiffs must not only prove compactness, cohesion, and white bloc voting, but also satisfy the totality-of-the-circumstances test. Gingles, 478 U.S. 30, 48-50, 106 S.Ct. 2752, 92 L.Ed.2d 25. Because section 2 "avoids the problem of potential overinclusion entirely by its own self-limitation," nationwide application of this provision is undoubtedly constitutional. S.Rep. No. 97-417, at 43 (1982) [hereinafter "1982 Senate Report"].
 
 
 39
 Second, the Supreme Court has upheld the VRA's nationwide ban on literacy tests, even though literacy tests are not per se unconstitutional. Mitchell, 400 U.S. at 112, 91 S.Ct. 260. Section 2 is more limited than the literacy test ban upheld in Mitchell because it does not label any procedure as impermissible per se. Rather, a procedure only fails section 2's test if, given the totality of the circumstances, it prevents minorities from participating effectively in the political process or electing candidates of their choice.
 
 
 40
 Third, after the Supreme Court's recent decision in Nevada v. Hibbs, it is clear that Congress need not document evidence of constitutional violations in every state to adopt a statute that has nationwide applicability. 123 S.Ct. at 1980. In Hibbs, the Supreme Court recognized that the "important shortcomings of some state policies" provided sufficient evidence of constitutional violations by the states. Id. (emphasis added). As Justice Scalia's dissent so vigorously pointed out, however, Congress failed to document evidence of unconstitutional discrimination in all fifty states. Id. at 1985 (Scalia, J., dissenting). Thus, we decline to hold that Congress had to find evidence of unconstitutional voting discrimination by each of the fifty states in order to apply section 2 nationwide.
 
 
 41
 Finally, even if nationwide evidence were a prerequisite to national utilization of section 2, Congress had before it sufficient evidence of discrimination in jurisdictions not covered by section 5 to warrant nationwide application. As the Senate Report noted, "[t]he hearing record before this committee and the House committee includes testimony as to the existence of discriminatory practices outside of the covered jurisdictions, including cases already adjudicated against various non-covered jurisdictions." 1982 Senate Report at 42 n. 161, U.S.Code Cong. & Admin.News at 220 n. 161. Indeed, the Eleventh Circuit concluded that "Congress did find evidence of substantial discrimination outside [covered] jurisdictions." Marengo County Comm'n, 731 F.2d at 1559.[9]
 
 
 42
 In sum, after "Congress [had] explored with great care the problem of racial discrimination in voting," Garrett, 531 U.S. at 373, 121 S.Ct. 955, and established an "undisputed record of racial discrimination," Fla. Prepaid, 527 U.S. at 640, 119 S.Ct. 2199, it was justified in applying section 2 nationwide. As Justice O'Connor has said, Congress amended section 2 in 1982 to address the "sad reality that there still are some communities in our Nation where racial politics do dominate the electoral process." Vera, 517 U.S. at 992, 116 S.Ct. 1941 (O'Connor, J., concurring). Thus, we conclude that Congress did not exceed its Fourteenth and Fifteenth Amendment enforcement powers by applying section 2 nationwide.
 
 
 2. The Results Test
 
 
 43
 Next we consider whether Congress exceeded its authority when it adopted section 2's results test, thereby repudiating any intent requirement. In Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court held that the Fourteenth and Fifteenth Amendments only prohibit purposeful discrimination. Therefore, the County argues, section 2's results test lacks congruence and proportionality because it does not require intentional discrimination and thereby prohibits electoral procedures that are constitutional under Bolden.
 
 
 44
 The most obvious problem with the County's argument is that on the exact same day that the Court issued its opinion in Bolden, the Court also held in City of Rome v. United States that section 5 of the VRA could constitutionally be applied to electoral procedures that only had discriminatory results and were not motivated by discriminatory intent. 446 U.S. 156, 173-178, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) ("We hold that, even if § 1 of the Amendment prohibits only purposeful discrimination, the prior decisions of this Court foreclose any argument that Congress may not, pursuant to § 2 [of the Fifteenth Amendment], outlaw voting practices that are discriminatory in effect."). As the Court explained, Congress justifiably adopted an effects test because requiring proof of intent would cause "the perpetuation of earlier, purposeful racial discrimination, regardless of whether the practices they prohibited were discriminatory only in effect." Id. at 177, 100 S.Ct. 1548.
 
 
 45
 Thus, under City of Rome, Congress can prohibit voting requirements that have discriminatory results. If section 5's results test is constitutional, the same must be true of section 2's results test. In fact, the constitutionality of section 2's results test is more certain because section 2 is far narrower than section 5's preclearance requirements.
 
 
 46
 Additionally, Congress thoroughly considered the practical and constitutional implications of the results test, and reasonably concluded that an intent test would not effectively prevent purposeful voting discrimination. As the Fifth Circuit viewed the congressional evidence, "[e]mpirical findings by Congress of persistent abuses of the electoral process, and the apparent failure of the intent test to rectify those abuses, were meticulously documented and borne out by ample testimony." Jones v. City of Lubbock, 727 F.2d 364, 375 (5th Cir.1984) (quoting Major v. Treen, 574 F.Supp. 325, 342-49 (E.D.La. 1983) (3-judge district court)). After listening to over 100 witnesses and at least 27 days of testimony in the Senate alone, Congress concluded that an intent requirement would undermine efforts to eliminate invidious discrimination. Even when courts applied a results test prior to Bolden, section 2 litigation was extremely difficult,[10] and very few cases were pursued each year. Bolden, however, "brought efforts to overcome discriminatory barriers to minority political participation almost to a complete halt."[11] Of the three voting rights lawyers that testified before Congress, not one had filed a voting rights lawsuit since the Court had issued its decision in Bolden.[12] The record before the Senate reflected that, after Bolden, district courts had vacated judgments of vote dilution and, on retrial under the intent test, discriminatory voting mechanisms withstood judicial scrutiny.[13] The intent test was hopelessly ineffective because those who enacted ancient voting requirements could not be subpoenaed from their graves, and present-day legislators were protected from testifying about their motives by legislative immunity.[14] Moreover, cities and counties did not maintain legislative histories, especially from fifty or a hundred years ago.[15] There was also testimony that the intent test was ineffective because purposeful discrimination could be hidden underneath false trails planted in the legislative record.[16] The intent test had the added burden of placing local judges in the difficult position of labeling their fellow public servants "racists." And the intent test's divisiveness threatened to undermine racial progress, thereby worsening purposeful discrimination.[17]
 
 
 47
 But these difficulties were not the principal justification for rejecting the intent test. As the Senate Report explained:
 
 
 48
 The main reason is that, simply put, the test asks the wrong question. In the Bolden case on remand, the district court after a tremendous expenditure of resources by the parties and the court, concluded that officials had acted more than 100 years ago for discriminatory motives. However, if an electoral system operates today to exclude blacks or Hispanics from a fair chance to participate, then the matter of what motives were in an official's mind 100 years ago is of the most limited relevance.
 
 
 49
 1982 Senate Report, supra, at 43, U.S.Code Cong. & Admin.News at 221.
 
 
 50
 After careful consideration, Congress found that the results test would be a carefully crafted measure to remedy purposeful discrimination. Congress examined twenty-three reported cases in which the results test was applied. It found that the test did not prohibit any particular voting procedure per se, that it did not assume racial bloc voting, that it was not aimed at achieving proportional representation, that a limited number of cases were filed, and that plaintiffs did not always win. Congress also determined that section 2 is "self-limiting" because of the numerous hurdles that plaintiffs must cross to establish a vote dilution claim.[18] In fact, calling section 2's test a "results test" is somewhat of a misnomer because the test does not look for mere disproportionality in electoral results. Rather, plaintiffs must establish that under the totality of the circumstances, the challenged procedure prevents minorities from effectively participating in the political process. In sum, we agree with the Eleventh Circuit's view that "Congress conducted extensive hearings and debate on all facets of the Voting Rights Act and concluded that the `results' test was necessary to secure the right to vote and to eliminate the effects of past purposeful discrimination." Marengo County Comm'n, 731 F.2d at 1557. Thus, we hold that the results test is a constitutional exercise of Congress' Fourteenth and Fifteenth Amendment enforcement powers.[19]
 
 IV.
 
 51
 Next, Blaine County challenges the district court's conclusion that its at-large voting system violated section 2. We review for clear error the district court's factual findings related to the vote dilution claim, as well as its ultimate determination that vote dilution exists. Old Person v. Cooney, 230 F.3d 1113, 1119 (9th Cir.2000). However, questions of law and mixed questions of law and fact are subject to de novo review. Smith v. Salt River Project, 109 F.3d 586 (9th Cir.1997). Because the district court did not commit legal error, and its factual findings and ultimate conclusion that vote dilution exists are not clearly erroneous, we affirm.
 
 A.
 
 52
 The County disputes the district court's finding that American Indians were politically cohesive. To be clear, the County does not challenge the district court's finding that American Indians vote cohesively. Indeed, the evidence indisputably shows that American Indians consistently bloc vote. Dr. Theodore Arrington, the United States's expert witness, testified that in all fourteen county-wide elections he examined, American Indian voters exceeded 67 percent cohesion — his threshold for cohesive minority voting. He also found American Indian voter cohesion in 100 percent of 19 elections for the Board of Harlem School District, an area of high American Indian concentration within Blaine County. Even the County's expert witness conceded that American Indians voted cohesively in 100 percent of County Commissioner elections and 95 percent of exogenous elections for county, state, and national offices.[20]
 
 
 53
 The County argues that the district court nonetheless erred because there was no evidence that American Indian voters have distinct political concerns. The County, however, misconstrues the inquiry for racial bloc voting. As the Supreme Court explained in Gingles, "a showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." 478 U.S. at 31, 106 S.Ct. 2752. Indeed, we have recognized that "proof that the minority has consistently voted differently helps one to ascertain whether the minority group members constitute a politically cohesive unit." Gomez v. City of Watsonville, 863 F.2d 1407, 1415 (9th Cir. 1988). Thus, the Supreme Court and this court both have held that it is actual voting patterns, not subjective interpretations of a minority group's political interests, that informs the political cohesiveness analysis.
 
 
 54
 Even if this were a matter of first impression, we would reject Blaine County's proposed standard because it would force courts to second guess voters' understanding of their own best interests. Indeed, the County's argument is not simply that American Indians lack shared interests, but that their shared interests are unfounded. The County, therefore, essentially asks us to deny the validity of American Indian voters' self-professed interests. Were we to do so, we would be answering what is inherently a political question, best left to the voters and their elected representatives. Thus, the district court applied the appropriate legal test for determining whether the American Indian population is politically cohesive, and its findings were well-supported by the record.
 
 B.
 
 55
 Blaine County also challenges the district court's refusal to consider low turnout among American Indian voters as evidence of a lack of political cohesion. We essentially rejected this argument in Gomez v. City of Watsonville, 863 F.2d 1407 (9th Cir.1988), holding that "[t]he district court erred by focusing on low minority voter registration and turnout as evidence that the minority community was not politically cohesive." Id. at 1416. Despite this unequivocal language, Blaine County suggests Gomez left open the possibility that low turnout could prove a lack of cohesiveness if there was evidence to support such a conclusion. At the very least, this is a strained reading of Gomez that simply cannot be squared with the plain language of our decision: "The court should have looked only to actual voting patterns rather than speculating as to the reasons why many Hispanics were apathetic." Id.
 
 
 56
 Apart from our precedent, Blaine County's suggested approach would undermine section 2's effectiveness. After all, "[l]ow voter registration and turnout have often been considered evidence of minority voters' lack of ability to participate effectively in the political process." Id. at 1416 n. 4. Thus, if low voter turnout could defeat a section 2 claim, excluded minority voters would find themselves in a vicious cycle: their exclusion from the political process would increase apathy, which in turn would undermine their ability to bring a legal challenge to the discriminatory practices, which would perpetuate low voter turnout, and so on. Thus, the district court did not err by rejecting low voter turnout as evidence of a lack of political cohesion.
 
 C.
 
 57
 Blaine County also contends that the district court erred in its analysis of white bloc voting because the court did not require white voter cohesion levels to surpass 60 percent. This contention flatly ignores the test laid out in Gingles for white bloc voting — "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it... to defeat the minority's preferred candidate." 478 U.S. at 49, 106 S.Ct. 2752. Indeed, Gingles rejected a blanket numerical threshold for white bloc voting because:
 
 
 58
 The amount of white bloc voting that can generally minimize or cancel black voters' ability to elect representatives of their choice ... will vary from district to district according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices ...; the percentage of registered voters in the district who are members of the minority group; the size of the district; and, in multimember districts, the number of seats open and the number of candidates in the field.
 
 
 59
 Id. at 56, 106 S.Ct. 2752 (citations omitted).
 
 
 60
 Applying the appropriate standard, the district court's factual findings were not clearly erroneous. Dr. Arrington specifically studied whether white voters were usually able to defeat the American Indian-preferred candidate. In five out of seven county-wide elections between an American Indian candidate and white candidate, the American Indian candidate lost despite receiving strong American Indian support. In four out of five contested Democratic primaries for the County Commission, white voters were able to defeat the American-Indian-preferred candidate. Similar bloc voting patterns were observed in Harlem School Board elections. Accordingly, the district court did not err in finding white bloc voting.
 
 D.
 
 61
 The County also argues that the district court committed legal error by placing greater weight on elections which involved American Indian candidates. In Old Person, however, we held that "contests between white and Indian candidates... are most probative of white bloc voting." 230 F.3d at 1127; see also Ruiz, 160 F.3d at 553 ("minority v. non minority election is more probative of racially polarized voting than a non-minority v. non-minority election"). Accordingly, we reject the County's argument because it is contrary to our settled precedent.
 
 E.
 
 62
 Next, Blaine County argues that the district court inappropriately relied on Harlem School Board elections to find cohesive voting patterns. But the district court did not rely exclusively, or even mostly, on the Harlem School Board elections. Rather, these elections provided additional evidence of American Indian voter cohesion and white bloc voting. As Dr. Arrington testified, the Harlem School Board elections provide useful evidence of cohesive voting patterns because American Indians make up a substantial percentage of the population of the school district and American Indians have frequently run for positions on the board. The district court did not commit legal error by examining exogenous elections to supplement its analysis of racially cohesive voting patterns in the at-large county commission elections. See Citizens for a Better Gretna v. City of Gretna, 834 F.2d 496, 502 (5th Cir.1987) ("Although exogenous elections alone could not prove racially polarized voting in Gretna aldermanic elections, the district court properly considered them as additional evidence of bloc voting — particularly in light of the sparsity of available data.").
 
 F.
 
 63
 The County also contends that the district court erred by failing to require proof that white bloc voting was the result of racial bias in the electorate. But as we have explained, "proof of groupwide or individual discriminatory motives has no part in a vote dilution claim." Ruiz, 160 F.3d at 557. Requiring proof of discriminatory motives among white voters in Blaine County would be divisive and would place an impossible burden on the plaintiffs. Id. at 558. Most important, the County's assumption that intentional discrimination among white voters must be shown is contrary to the plain language of section 2's results test. See Gingles, 478 U.S. at 43-44, 106 S.Ct. 2752 (holding that section 2 "repudiated" the intent test). Thus, we reject the notion that the district court was required to unearth evidence of discrimination in the white electorate to find a section 2 violation.[21]
 
 G.
 
 64
 The County next makes a series of challenges to the district court's determination that there was a history of official discrimination against American Indians. First, it claims the district court here improperly relied on another district court's Findings of Facts and Conclusions of Law in Old Person v. Cooney, 230 F.3d at 1129. We disagree. Although the district court pointed to the factual findings in Old Person for a detailed description of the history of racial discrimination against American Indians in Montana, it relied on the "extensive testimony" presented here by the United States.
 
 
 65
 In light of the breadth of this testimony, the district court's factual findings on this issue did not constitute clear error. As the United States's expert witness testified, Montana laws repeatedly discriminated against American Indians' exercise of the franchise.[22] In 1897, for example, the Montana legislature passed a law prohibiting American Indians from voting unless they were government employees or owned a home outside of a reservation.[23] Two years later, the Montana legislature requested that the federal government prohibit American Indians from leaving their reservations.[24] In 1912, the State Attorney General declared that any American Indian who participated in tribal affairs could not participate in general or school board elections. The Montana legislature also passed legislation in 1919 prohibiting the creation of an electoral district within the boundaries of a reservation. Finally, beginning in 1932 and continuing through 1963, the Montana legislature enacted various laws limiting voting to taxpayers, which served to disenfranchise many reservation residents who were exempt from property taxes. In short, we find that the district court's conclusion that there was a history of official discrimination against American Indians in Montana was not clearly erroneous.
 
 H.
 
 66
 Blaine County also challenges the district court's totality-of-the-circumstances analysis on several fronts. First, the County argues that the district court could only look at official discrimination by Blaine County, not the state or federal government. We rejected this exact argument in Gomez, 863 F.2d at 1418, because this overly narrow interpretation of the first Senate factor "would result in precisely the sort of mechanistic application of the Senate factors that the Senate report emphatically rejects." Id.
 
 
 67
 Next, the County argues in a single sentence that there is no evidence of racially polarized voting. Both sides' experts agreed that American Indians almost always vote cohesively, and Dr. Arrington, the government's expert, testified that white voters frequently vote as a bloc, which precludes American Indians from electing candidates of their choice. Even if reasonable minds could disagree, the County does not explain why the district court's finding was clearly erroneous.
 
 
 68
 The County contends that there is no evidence that it uses other procedures to discriminate against minority voters. However, the evidence showed that staggered terms prevent American Indians from bullet voting,[25] and the County's enormous size makes it extremely difficult for American Indian candidates to campaign county-wide in at-large elections. Thus, the district court did not commit clear error in finding that Blaine County's electoral procedures enhanced the opportunity for discrimination against American Indians.
 
 
 69
 The County also argues that there are no socioeconomic differences between American Indians and whites in Blaine County. However, the government's evidence showed that Blaine County's American Indian families are three times more likely than its white families to live below the poverty line. Similar disparities were found in graduation, unemployment, and vehicle-ownership rates. Along the same lines, the County contends that there is no causal link between discrimination and whatever socioeconomic disparities might exist. There was, however, extensive evidence of official discrimination by federal, state, and local governments against Montana's American Indian population.
 
 
 70
 The County next contends that American Indians are unwilling to run for office. The district court found, however, that American Indians frequently run for the Harlem School Board, which demonstrates that there is a pool of qualified American Indian candidates. American Indians also testified that they were currently unwilling to run for County Commissioner because white bloc voting made it impossible for an American Indian to succeed in an at-large election. The County again fails to explain how the district court's finding on this point was clearly erroneous.
 
 
 71
 The County contends that at-large elections make the county commissioners responsive to voters throughout Blaine County. However, the district court found that Montana does not require at-large elections and that the county government depends largely on residency districts for purposes of road maintenance and appointments to County Boards, Authorities and Commissions. The County does not dispute these findings, and therefore we conclude that the district court did not clearly err in determining that the asserted justifications for having at-large elections were tenuous.
 
 
 72
 Finally, the County argues that there are no structural barriers that prevent American Indians from voting. Although voter registration barriers would certainly provide evidence that minority voters were prevented from participating in the political process, the absence of such barriers hardly proves that the County's at-large voting system is permissible under section 2.
 
 
 73
 In short, the district court did not err in its totality of the circumstances analysis.[26]
 
 V.
 
 74
 The County argues that the district court failed to rule on its objections to the expert testimony of Drs. Arrington, Hoxie, and McCool. Our decision in Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053 (9th Cir.2002),"require[s] a district court to make some kind of reliability determination to fulfill its gatekeeping function" under Federal Rules of Evidence 702. Id. at 1066 (emphasis in original). Here, the district court made the necessary reliability determination with respect to Dr. Arrington's testimony and report. After all, the district court explicitly found that race-identified registration lists, utilized by Dr. Arrington, "are consistently accepted methods of data collection for § 2 voting rights cases."[27]
 
 
 75
 We agree that the district court failed to determine the reliability of portions of Dr. Hoxie's testimony and the entirety of Dr. McCool's expert testimony, despite objections by Blaine County.[28] The district court's decision is not reversible, however, if its failure to make the required reliability determination was harmless. Mukhtar, 299 F.3d at 1065.
 
 
 76
 We conclude that the district court's error was harmless because the tainted testimony was not essential to the district court's ultimate finding of vote dilution. The district court's memorandum decision never specifically cites the testimony of Dr. Hoxie or Dr. McCool. At most, the district court relied on this testimony to find a history of official discrimination, the first Senate factor. But Dr. Hoxie's testimony regarding events between 1844 and 1959, which the County does not challenge, provides independent evidence of official discrimination by the State of Montana.
 
 
 77
 In any event, the first Senate factor is not critical. As Gingles explained, "the most important Senate Report factors bearing on § 2 challenges to multimember districts are the `extent to which minority group members have been elected to public office in the jurisdiction' and the `extent to which voting in the elections of the state or political subdivision is racially polarized.'" 478 U.S. at 51 n. 15, 106 S.Ct. 2752. In fact, Gingles expressly stated that other factors, such as the first Senate factor, "are supportive of, but not essential to, a minority voter's claim." Id. Therefore, even if we exclude the tainted testimony, and even if we assume that testimony was critical to the district court's analysis of the first Senate factor, we would not disturb the district court's ultimate finding of vote dilution. Accordingly, any Mukhtar error here was harmless.
 
 VI.
 
 78
 In sum, we affirm the district court's summary judgment upholding section 2's constitutionality and its declaration that Blaine County's at-large voting system violated section 2.
 
 
 79
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Blaine County also argues that the district court improperly admitted the testimony of the United States's expert witnesses. Although we agree that the district court's evidentiary rulings were erroneous in one limited respect, we ultimately conclude that this error was harmless
 
 
 [2]
 Voters in District 1, which has a majority American Indian voting age population (just over 87 percent), recently elected Blaine County's first American Indian County Commissioner
 
 
 [3]
 Section 2 originally provided:
 No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.
 Pub.L. No. 89-110, tit. I, § 2, 79 Stat. 437 (1965).
 
 
 [4]
 A jurisdiction was "covered" for purposes of section 5 if it used a literacy or other test for registering or voting and if less than half of its voting age population voted in the 1964 presidential election. The original covered jurisdictions were Alabama, Georgia, Louisiana, Mississippi, South Carolina, Virginia, and large parts of North Carolina. Daniel Hays Lowenstein and Richard L. Hasen,Election Law: Cases and Materials 35 (2d ed.2001).
 
 
 [5]
 The jurisdictional statement inMississippi Republican Executive Committee specifically asked "[w]hether Section 2, if construed to prohibit anything other than intentional discrimination on the basis of race in registration and voting, exceeds the power vested in Congress by the Fifteenth Amendment." 469 U.S. at 1003, 105 S.Ct. 416 (Stevens, J., concurring).
 
 
 [6]
 The Supreme Court opinion cited by the County for this proposition actually said:
 Although we have noted that our summary dismissals are to be taken as rulings on the merits in the sense that they rejected the specific challenges presented and left undisturbed the judgment appealed from, we have also explained that they do not have the same precedential value as does an opinion of this Court after briefing and oral argument on the merits. It is not at all unusual for the Court to find it appropriate to give full consideration to a question that has been the subject of previous summary action....
 Lunding v. N.Y. Tax Appeals Tribunal, 522 U.S. 287, 307, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998). Thus, the Supreme Court was referring to the precedential value it accords its own summary dispositions, not denying the binding effect of summary dispositions on the lower courts.
 
 
 [7]
 Justice O'Connor cited the following cases that have upheld section 2's constitutionality:United States v. Marengo County Comm'n, 731 F.2d 1546, 1556-1563 (11th Cir.1984), cert. denied 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311; Jones v. Lubbock, 727 F.2d 364, 372-75 (5th Cir.1984); Shaw v. Hunt, 861 F.Supp. 408, 438 (E.D.N.C.1994) (3-judge district court), aff'd in part, rev'd in part, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996); Prosser v. Elections Bd., 793 F.Supp. 859, 869 (W.D.Wis.1992) (3-judge district court); Wesley v. Collins, 605 F.Supp. 802, 808 (M.D.Tenn.1985), aff'd 791 F.2d 1255 (6th Cir.1986); Sierra v. El Paso Indep. Sch. Dist., 591 F.Supp. 802, 806 (W.D.Tex.1984); Major v. Treen, 574 F.Supp. 325, 342-49 (E.D.La.1983) (3-judge district court).
 
 
 [8]
 Voting Rights Act: Hearings Before the Sub-comm. on the Constitution of the Senate Comm. on the Judiciary, 97th Cong. 368 (1982) [hereinafter "VRA Hearings"] (statement of Laughlin McDonald, Director, Southern Regional Office, American Civil Liberties Union Foundation) ("[W]e tried ... virtually every kind of civil rights lawsuit there is ... and there's no question that a vote dilution suit is the most difficult.... The optimum dilution suit, quite frankly, was nothing less than a presentation of the complete racial history of the jurisdiction.").
 
 
 [9]
 Blaine County quibbles about the sufficiency of the evidence in the congressional record supporting discrimination in non-covered jurisdictions. It argues, for example, that most of the reported cases cited by the United States ended in consent decrees, and that such settlements are not a reliable indicator of purposeful voting discrimination because of the financial incentives to settle. Although we cannot ascertain the motives of jurisdictions that settled these voting rights cases, a consent decree requires court approval, making it unlikely that spurious claims of purposeful voting discrimination would be settled through an enforceable consent decree
 
 
 [10]
 VRA Hearings, supra note 8, at 796-97 (statement of Armand Derfner, The Joint Center for Political Studies).
 
 
 [11]
 VRA Hearings, supra note 8, at 462 (prepared statement of Hon. Henry L. March, Mayor of the City of Richmond, Va.); see also id. at 640 (statement of David Walbert, Former Law Professor, Emory University) ("I have not filed a dilution case since Mobile.").
 
 
 [12]
 VRA Hearings, supra note 8, at 813 (prepared statement of Armand Derfner).
 
 
 [13]
 1982 Senate Report,supra, at 37-39.
 
 
 [14]
 1982 Senate Report,supra, at 36-37.
 
 
 [15]
 VRA Hearings, supra note 8, at 709 (Letter from the Lawyers' Committee for Civil Rights Under Law re: Questions and Answers on the Section 2 "Results" Standard of S.1992).
 
 
 [16]
 1982 Senate Report,supra, at 37.
 
 
 [17]
 Pamela S. Karlan,Two Section Twos and Two Section Fives: Voting Rights and Remedies After Flores, 39 Wm. & Mary L.Rev. 725, 735 (1998).
 
 
 [18]
 1982 Senate Report,supra, at 32-33.
 
 
 [19]
 The County argues that section 2 requires proportional representation, apparently ignoring the statute's plain language: "[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. 1973(b). The County also contends that section 2 must contain a sunset provision and an opt-out provision like section 5 of the VRA. Although the Supreme Court has viewed such provisions favorably because of section 5's extraordinary remedy, it has expressly rejected the notion that the Fourteenth Amendment "requires termination dates, geographic restrictions, or egregious predicates."City of Boerne, 521 U.S. at 533, 117 S.Ct. 2157. Section 2 therefore need not contain such limitations because it is a narrower provision than section 5 of the VRA.
 
 
 [20]
 The County's expert witness assumed a racial group was cohesive if its members voted at 60 percent cohesion
 
 
 [21]
 We reject the County's contention thatSmith v. Salt River, 109 F.3d 586 (1997), compels a contrary conclusion. Although Salt River did hold that "a bare statistical showing of disproportionate impact on a racial minority does not satisfy the § 2 `results' inquiry," we never suggested that discrimination in the electorate must be proven. Id. at 595. Salt River simply held that there must be a causal connection between a voting requirement and a discriminatory result. Id. There is such a connection here: Blaine County's at-large voting system enhances the possibility that a bloc of white voters will prevent American Indians from electing candidates of their choice. In challenges to multimember districts, evidence of racial bloc voting provides the requisite causal link between the voting procedure and the discriminatory result. Once such a connection is shown, nothing in Salt River suggests that plaintiffs have the additional burden of proving that white bloc voting is due to discriminatory motives. Accordingly, the district court did not err by declining to inquire into the divisive and irrelevant issue of whether white voters in Blaine County are motivated by discriminatory motives.
 
 
 [22]
 Because these discriminatory laws were enacted by the Montana legislature, we find no merit in the County's assertion that the district court improperly relied on evidence of official discrimination by the federal government
 
 
 [23]
 The fact that these laws targeted American Indians undermines the County's contention that the statutes considered by the district court were irrelevant because they were not aimed at American Indian voters
 
 
 [24]
 The County argues that segregation within its borders is merely the result of benign federal policies and choices by American Indians. The Montana legislature's support for a federal law prohibiting American Indians from traveling outside of reservations, as documented in the record, amply supports the district court's contrary conclusion
 
 
 [25]
 When all candidates for a legislative body are elected at-large at the same time, a minority group still has the opportunity to elect a minority-preferred candidate through bullet voting, also known as one-shot voting. Minority voters can concentrate their vote on electing one minority-preferred candidate, while the majority vote will be split among the majority candidates. As the U.S. Commission on Civil Rights explained:
 Consider [a] town of 600 whites and 400 blacks with an at-large election to choose four council members. Each voter is able to cast four votes. Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else. The result is that each white candidate receives about 300 votes and the black candidate receives 400 votes. The black has probably won a seat. This technique is called single-shot voting. Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates.
 U.S. Commission on Civil Rights, The Voting Rights Act: Ten Years After 206-207 (1975). Because Blaine County's at-large elections are staggered, American Indians are prevented from utilizing bullet voting to elect a candidate of their choice to the Blaine County Commission.
 
 
 [26]
 Even if the County persuaded us that the district court had erred with respect to one factor,Gingles makes clear that not every Senate factor, or even a majority of Senate factors, must weigh in favor of a vote dilution finding. 478 U.S. at 45, 106 S.Ct. 2752. The County has not convincingly argued that the district court erred in its analysis of a single factor, much less that such an error undermined the district court's ultimate finding of vote dilution to such an extent that the overall vote dilution determination was clearly erroneous. See id. at 79, 106 S.Ct. 2752.
 
 
 [27]
 We also hold that the district court's decision to admit Dr. Arrington's testimony did not constitute an abuse of discretionSee Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The County challenges Dr. Arrington's use of race-identified registration lists. However, both Dr. Arrington and Dr. Weber, the County's expert, testified that race-identified registration lists are commonly used and acceptable tools for examining racial voting patterns. Indeed, race-identified registration lists are arguably superior to the alternatives, such as the use of census data, because they make no assumptions about registration rates in particular communities. Moreover, the notion that Dr. Arrington's analysis was methodologically flawed is belied by the fact that Dr. Arrington's and Dr. Weber's bivariate ecological regression analysis and homogenous precinct analysis yielded similar results. Finally, Dr. Arrington actually went beyond procedures used in previous section 2 cases and divided his coders into separate groups. Thus, there was no abuse of discretion in admitting Dr. Arrington's testimony and exhibits.
 
 
 [28]
 Because we agree that the district court failed to expressly determine the reliability of Dr. Hoxie and Dr. McCool's testimony, we do not address the County's alternative argument that their testimony should not have been admitted because it was methodologically flawed. However, we note that the County does not challenge Dr. Hoxie's methodology with respect to his examination of the period 1844-1959