FOR PUBLICATION
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FILED

NOV 02 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

LESLIE FELDMAN; LUZ
MAGALLANES; MERCEDEZ HYMES;
JULIO MORERA; CLEO OVALLE;
PETERSON ZAH, Former Chairman and
First President of the Navajo Nation; THE
DEMOCRATIC NATIONAL
COMMITTEE; DSCC, AKA Democratic
Senatorial Campaign Committee; THE
ARIZONA DEMOCRATIC PARTY;
KIRKPATRICK FOR U.S. SENATE;
HILLARY FOR AMERICA,

      Plaintiffs-Appellants,

BERNIE 2016, INC.,

      Intervenor-Plaintiff-
      Appellant,

  v.

ARIZONA SECRETARY OF STATE'S
OFFICE; MICHELE REAGAN, in her
official capacity as Secretary of State of
Arizona; MARICOPA COUNTY BOARD
OF SUPERVISORS; DENNY BARNEY;
STEVE CHUCRI; ANDY KUNASEK;
CLINT HICKMAN; STEVE
GALLARDO, member of the Maricopa
County Board of Supervisors, in their
official capacities; MARICOPA COUNTY

No.   16-16865

D.C. No. 2:16-cv-01065-DLR

OPINION

RECORDER AND ELECTIONS
DEPARTMENT; HELEN PURCELL, in
her official capacity as Maricopa County
Recorder; KAREN OSBORNE, in her
official capacity as Maricopa County
Elections Director; MARK BRNOVICH,
in his official capacity as Arizona Attorney
General,

Defendants-Appellees,

THE ARIZONA REPUBLICAN PARTY;
DEBBIE LESKO; TONY RIVERO; BILL
GATES; SUZANNE KLAPP

Intervenor-Defendants-
Appellees.

Appeal from the United States District Court
for the District of Arizona
Douglas L. Rayes, District Judge, Presiding

Argued and Submitted October 26, 2016
Pasadena, California

Before: Sidney R. Thomas, Chief Judge, and Carlos T. Bea and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Bea, Circuit Judge:

In the 1970s[1] Arizona enacted a statute which required each voter who votes in person to cast his or her ballot at the precinct polling station at which the voter

---

[1] Ariz. Rev. Stat. §§ 16-122, 16-135, 16-584 (codified in 1979).

was registered to vote (the "precinct vote rule").  Since then Arizona has amended its statutes to adopt voting by mail, so long as the vote is received by election officials by election day. Arizona has also enacted early in-person voting during the 27 days preceding election day at designated early voting locations.  Further, on election day, a voter who has received a ballot through the mail may deposit that ballot at any precinct in the county.  But, if one is voting in the traditional in-person manner on election day, the precinct vote rule applies: for the vote to be valid, one must vote at the assigned polling place or vote center.  A vote cast elsewhere will not be counted.

Feldman and other Appellants[2] here challenged the precinct vote rule on the grounds that it violated the federal Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, and unjustifiably burdened their election rights guaranteed by the Fourteenth Amendment of the federal Constitution. The district court denied Feldman's motion for a preliminary injunction. Feldman brought an emergency

---

[2] The appellants here (plaintiffs below) are Leslie Feldman, Luz Magallanes, Mercedez Hymes, Julio Morera, and Cleo Ovalle, registered Democratic voters in Maricopa County, Arizona; Peterson Zah, former Chairman and First President of the Navajo Nation and registered voter in Apache County, Arizona; the Democratic National Committee; the DSCC, aka Democratic Senatorial Campaign Committee; the Arizona Democratic Party; a committee supporting the election of Democratic United States Representative Ann Kirkpatrick to U.S. Senate; and Hillary for America, a committee supporting the election of Hillary Clinton as President of the United States.  The intervenor-plaintiff/appellant is Bernie 2016, Inc., a committee supporting the election of Bernie Sanders as President of the United States.  For convenience, we refer to the appellants as "Feldman."

appeal before us.

Feldman's VRA claim is that the precinct vote rule imposes a discriminatory burden upon Hispanic, African-American and Native American citizens of Arizona ("minority voters") because it affords them less opportunity than have other members of the electorate to participate in the electoral process and to elect representatives of their choice. To prove her claim, Feldman proffered expert witness opinion evidence, some of which was accepted by the district court. Expert evidence, which the district court found relevant, showed that the share of minority in-person voters who failed to vote in their precincts exceeded their proportional representation in the electorate.

We find that the precinct vote rule, as administered by Arizona, probably does not impermissibly burden minority voters by giving them less opportunity than non-minorities to participate in the political process. But even assuming, without deciding, that it imposes a cognizable burden on minority voters, Feldman has not shown that Arizona's enactment of the precinct vote rule is linked to social and historical conditions that have or currently produce racial discrimination against minority voters. Thus, we find that the district court correctly denied relief for the claimed violation of the VRA.

Similarly, the district court correctly found that the constitutional violation

4

claims failed because the precinct vote rule, when considered together with other options available to Arizona voters, imposes only a minimal burden upon minority and majority voters. Such a minimal burden is sufficiently justified by Arizona's interests in effective administration of voting in the State.

We affirm.

I.

If an Arizona voter arrives at a polling place on election day to vote, but his or her name does not appear on the voting register, he or she may still vote, but only through a provisional ballot. Ariz. Rev. Stat. §§ 16-122, 16-135, 16-584. This scenario may occur either because the voter recently moved or due to inaccuracies in the official records. Later, the state reviews all provisional ballots and counts those votes cast by voters confirmed to be eligible to vote. *Id*. Arizona will not count a provisional ballot cast out of the voter's correct precinct (known as an "out-of-precinct" or "OOP ballot"). *Id*. Widely-used early vote by mail alternatives permit voters to receive ballots by mail several weeks before an election and cast these ballots through the mail without paying postage or by dropping them at any polling place in their county on election day. A.R.S. §§ 16-542, 16-548. Arizona recently has permitted counties to choose between the

5

traditional precinct model and "vote centers," wherein voters from multiple precincts can vote at a single location.[3] A.R.S. § 16-411.

As noted, Arizona's precinct vote rule has existed since the 1970s. In the 2012 elections, Arizona election officials determined that 10,979 ballots were cast OOP and thus not counted, which constituted 0.5% of total ballots cast in the state.[4] Feldman submitted an expert report by Dr. Jonathan Rodden, credited by the district court for the purposes of her motion, which concluded that minorities were over-represented amongst those who cast OOP ballots in certain Arizona population centers. Other portions of the factual record are discussed as they become relevant.

---

[3] In 2011, Arizona revised its election law to permit counties to choose between using "vote centers" or precincts. A.R.S. § 16-411. The "vote center" approach permits voters from diverse voting precincts in a county to receive a ballot tailored to include races for which they are eligible and to cast it at a single location. *Id*. The "precinct" approach restricts a voter to receiving and casting his in-person ballot at his precinct's designated polling place. Under either approach, the ballot received by a voter is tailored to include only those candidates or issues for which the voter is entitled to vote based on the voter's claimed place of residency. The ballot will not be counted if the voter is found to be ineligible.

[4] In the 2008 election 14,885 OOP ballots were not counted, constituting 0.6% of total ballots cast. Smaller numbers of OOP ballots were rejected in the 2010 (0.3% of total ballots cast) and 2014 (0.2% of total ballots cast) elections.

In April 2016, Feldman sued Arizona[5] challenging its policy of rejecting OOP ballots. Feldman argued that Arizona's rejection of OOP ballots pursuant to the precinct vote rule violates § 2 of the VRA by disparately burdening the electoral opportunities of Hispanic, Native American, and African American voters. She also argued the precinct vote rule violates the Fourteenth Amendment by improperly burdening voting rights and by raising equal protection concerns. In June 2016, Feldman moved for a preliminary injunction to require Arizona to count those portions of OOP ballots for which the voter is eligible to vote.[6]

After full briefing, on October 11, 2016, the district court issued an order denying the motion for a preliminary injunction because it found Feldman was unlikely to succeed on the merits of her claims or suffer irreparable harm if an injunction did not issue. As to the § 2 claim, the district court found that the disparate burden observed by Dr. Rodden did not constitute a cognizable harm under the VRA because it did not meaningfully limit minority groups' access to the

---

[5] The appellees here (defendants below) are the Arizona Secretary of State's Office; Arizona Secretary of State Michele Reagan in her official capacity; the Maricopa County Board of Supervisors; members of the Maricopa County Board of Supervisors Denny Barney, Steve Chucri, Andy Kunasek, Clint Hickman, and Steve Gallardo in their official capacities; the Maricopa County Recorder and Elections Department; Maricopa County Recorder Helen Purcell and Maricopa County Elections Director Karen Osbourne in their official capacities; and Arizona Attorney General Mark Brnovich in his official capacity.

[6] For example, most OOP voters would be eligible to vote in the Presidential election even if they were ineligible to vote for precinct-specific elections because they were not in fact residents of the precinct in which they erroneously voted.

political process and was not shown to be linked to historical discrimination in Arizona. As to the Fourteenth Amendment claim, the district court held that Arizona's precinct vote rule constituted a minimal burden on voting because it simply required that voters appear at the proper polling location on election day and was justified by the administrative advantages to the State of using a precinct voting system. The district court also concluded that Feldman was unlikely to succeed on her equal protection claim because she had not advanced a coherent theory for it.

Feldman filed a timely notice of interlocutory appeal on October 15, 2016 and on October 18, 2016 filed an emergency motion with this court for an injunction pending appeal and for an expedited appeal. On October 19, 2016, a motions panel granted the request for an expedited appeal. The parties were directed to file simultaneous merits briefs by October 24, 2016, and the appeal was argued orally on October 26, 2016.[7]

## II.

We incorporate section II of the opinion from the companion appeal that involves the same parties (*Feldman v. Arizona Sec'y of State's Office*, No. 16-

---

[7] In addition to this appeal, Feldman appealed another of the district court's orders denying a separate motion to preliminarily enjoin other election practices challenged in the complaint. That appeal has similarly been expedited and is the subject of a separate disposition. *See Feldman v. Arizona Sec'y of State's Office*, No. 16-16698, — F.3d — (9th Cir. 2016).

8

16698, — F.3d — (9th Cir. 2016)) as describing the proper standard of review for an interlocutory appeal of a denial of a preliminary injunction. Generally, a district court's decision regarding preliminary injunctive relief is subject to limited review. *Flexible Lifeline Sys., Inc., v. Precision Lift, Inc.*, 654 F.3d 989, 993-94 (9th Cir. 2011) (per curiam). The court should be reversed only if it abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *FTC v. Enforma Natural Products*, 362 F.3d 1204, 1211-12 (9th Cir. 2004).

### III.

**VRA Claim**

We also incorporate section III.A.1 of the opinion from the companion appeal that involves the same parties (*Feldman v. Arizona Sec'y of State's Office*, No. 16-16698, — F.3d — (9th Cir. 2016)) as describing the proper framework for analyzing a VRA § 2 claim. This opinion adopts the two-step framework adopted by a number of our sister circuits for evaluating a VRA § 2 claim. We use this framework to determine whether the district court properly concluded that Feldman was unlikely to succeed on the merits of her claim that Arizona's precinct vote rule violated § 2 of the VRA. Feldman offers two sets of arguments as to why the

9

district court erred in concluding she was unlikely to succeed on the merits of her VRA § 2 claim. We consider each in turn.

A.

First, she argues that Arizona's precinct vote rule imposes a discriminatory burden on minority voters in violation of VRA § 2. Specifically, she asserts that the report by Dr. Rodden, credited by the district court for the purposes of this motion, was sufficient to show a cognizable disparate burden under the VRA.

We have grave doubts that the precinct vote rule gives minority voters less opportunities to participate in the political process than it gives to other, majority voters. That more minorities vote OOP than is reflective of their proportionate number in the electorate does not prove that the precinct vote rule denies or abridges their opportunity to learn of the locations of their precinct polling places or to get to them in time to vote. There is no evidence in the record that minority voters were given misinformation regarding the locations of their correct precinct polling places, while non-minority voters were given correct information.[8] Nor was there evidence that minority voters' precinct polling places were located where

---

[8] There is evidence in the record that a small number of Spanish language voter communications included erroneous information, but there is no indication that these were anything but isolated typographical errors and, in any event, none of these errors gave minority voters incorrect information regarding the location of their polling places.

10

it would be more difficult for minority voters to find them, than were the corresponding precinct polling places of non-minority voters.

A.R.S. § 16-584 merely imposes a prerequisite to voting: it requires voters to vote in their precinct or their vote will not be counted. It is analogous to a registration requirement: If prospective voters do not register to vote, they cannot vote; their vote will not be counted. Thus, it might seem that the required causal connection between the voting prerequisite and the observed disproportionate result simply was not proved. *Gonzalez v. Arizona*, 677 F.3d 383, 405 (2012) ("Said otherwise, a § 2 challenge based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes that disparity, will be rejected.") (internal quotation marks omitted).

Nonetheless, we recognize that the district court found the results of the expert witness's tabulation to have shown disproportionate disqualification of minority votes, ascribed by the district court in part to the precinct vote rule. Giving due deference to the district court's factual findings, we will presume, without deciding, that Feldman did carry her burden of proof on the first step of her VRA claim. But, we affirm the district court's finding that she did not carry her burden of proof on the second step of her VRA claim: that the disproportionate

burden, in light of the totality of the circumstances, interacted with racial

discrimination "to cause an inequality in the opportunities enjoyed by [minority]

and [non-minority] voters to elect their preferred representatives." *Thornburg v.*

*Gingles*, 478 U.S. 30, 47 (1986).

B.

Second, Feldman argues that the district court misapplied the *Gingles*

factors, which are non-exclusive factors incorporated by the Supreme Court to

guide courts' analyses of whether a voting practice, viewed in light of the totality

of the circumstances, limits minority access to electoral opportunities or the

political process.[9] *Gingles*, 478 U.S. at 44-45. On appeal, Feldman asserts that the

district court erred as "a matter of fact and law" in its analysis of the *Gingles*

factors. As to the purported error of law, Feldman specifies that: "As a legal

matter, the court erred in holding that establishing a link between a disparate

---

[9] These factors include: "1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; 2) the extent to which voting in the elections of the state or political subdivision is racially polarized; 3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; 4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; 5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; 6) whether political campaigns have been characterized by overt or subtle racial appeals; [and] 7) the extent to which members of the minority group have been elected to public office in the jurisdiction." 478 U.S. at 36–37 (internal quotation marks omitted).

12

burden and socioeconomic disparities resulting from discrimination does not satisfy step two of the test for VRA vote-denial claims." On the contrary, the district court indeed applied this correct standard. It found that "Plaintiffs have only loosely linked the observed disparities in minority OOP voting to social and historical conditions that have produced discrimination." The district court simply found that Feldman had not established a sufficient link. Feldman is left with her challenge to the district court's factual findings on the second prong, which are reviewed for clear error. *Independent Living Ctr. of S. California, Inc. v. Shewry*, 543 F.3d 1050, 1055 (9th Cir. 2008). At oral argument, Feldman's counsel chose not to press her claim of factual finding error. Nonetheless, we must consider whether the district court's conclusion that the factual record did not show that the observed burden "in part [was] caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class" as reflected in the *Gingles* factors was clearly erroneous. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) (internal quotation marks omitted).

In challenging the district court's factual findings, Feldman references the expert report of another expert witness, Dr. Allan Lichtman, as well as evidence (some of it also from Dr. Lichtman's report) that minority voters 1) have higher

13

rates of residential mobility, 2) have less access to vehicles and hold jobs without flexible working hours, and 3) cannot inform themselves about voting rules because of a historical language barrier, as sufficient to satisfy the second prong of VRA § 2. For the reasons discussed below, the district court's factual determination that this evidence failed to establish the requisite link was not clearly erroneous.

The district court expressly referenced the proper standard for the second prong of a VRA § 2 analysis: "that burden [identified in the first prong] must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class," which it recognized can be satisfied in part by turning to the *Gingles* factors. The district court then looked to the totality of the circumstances (as required by the statute) to examine the practical effect of the precinct vote rule on minority voters' access to the political process and electoral opportunities. Finally, the district court examined whether Arizona's precinct vote rule was caused by or linked to social or historical conditions that have produced discrimination and found that various socioeconomic disparities referenced by Feldman that correlated to some degree with race were alone insufficient to satisfy this second prong.

On appeal, Feldman cites the report by Dr. Lichtman to establish that the *Gingles* factors show that Arizona's precinct vote rule is linked to or caused by historical or ongoing discriminatory practices that limit minority access to electoral opportunities or the political process.  Reading his report reveals several inaccuracies that would clearly justify the district court's decision not to credit it as sufficient to satisfy the *Gingles* factors.  First off, Lichtman references the fact that Arizona was subject to VRA § 5 preclearance requirements until 2013 as evidence of official discrimination.  This assertion, of course, contradicts the clear guidance of the Supreme Court from *Shelby County v. Holder*, which found the formula used to determine which states were subject to preclearance requirements unconstitutional because it was "based on 40–year–old facts having no logical relation to the present day."  133 S. Ct. 2612, 2629 (2013).  Then, Lichtman points to Arizona's passage of a voter initiative which banned *"affirmative action"* (racial preferences) as evidence of a history of "official discrimination."  Ending preferential treatment of individuals on the basis of their race, as a logical matter, cannot be considered discrimination and such measures have consequently been upheld by this and other courts.  *See Schuette v. Coalition to Defend Affirmative Action*, 134 S. Ct. 1623 (2014) (Michigan ballot Proposal 2); *Coalition for Econ. Equity v. Wilson*, 122 F.3d 692 (9th Cir.1997) (California ballot Proposition 209).

15

Then, Lichtman points to other actions by Arizona to show a history of official discrimination, such as reducing the number of polling locations in the 2016 presidential primary election, waiting several years longer than some other states to declare Martin Luther King Day a state holiday, or promulgating voter identification laws that were later found to be preempted by federal statute, which have at best a very tenuous connection to discrimination.

Given such errors, and given substantial rebuttal from other experts (one of whom stated that Lichtman's report is "single-minded, conclusory, and one-sided, and frequently omit[s] mention of contradictory data or important context"), Lichtman's report is insufficient to meet the second prong of the VRA test. Even taken at face value, the Lichtman report fails to show that any burden from the precinct vote rule on minorities' opportunity to participate in the political process is "caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 637 (6th Cir. 2016) (quoting *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014)). The Lichtman report does not show how any historical racial discrimination caused more residential mobility or less access to transportation, which it claims are the background reasons for more minority voters than non-minority voters voting in the wrong

16

precinct. Accordingly, the district court did not clearly err in concluding that Feldman failed to prove that racial discrimination is a substantial cause of any socioeconomic disparities alleged to cause more out-of-precinct voting by minorities.

Moreover, any linkage between racial discrimination, the mobility and transportation access issues noted by the Lichtman report, and the evidence that more minority voters than non-minority voters vote outside their precinct, is too attenuated to support a claim under § 2 of the VRA, which requires a connection between a challenged voting rule and racial discrimination. As the Sixth Circuit explained, the second prong of the VRA test considers whether the challenged practice "has the effect, as it interacts with social and historical conditions, of causing racial inequality in the opportunity to vote." *Ohio Democratic Party v. Husted*, 834 F.3d at 638 (emphasis omitted); *id.* (concluding that "the second step asks not just whether social and historical conditions 'result in' a disparate impact, but whether the challenged voting standard or practice causes the discriminatory impact as it interacts with social and historical conditions") (emphasis omitted). As the district court noted, "if the requisite causal link under § 2 could be established primarily by pointing to socioeconomic disparities between minorities and whites, then nearly all voting regulations could conceivably violate the VRA because

17

nearly all costs of voting are heavier for socioeconomically disadvantaged voters." Indeed, at oral argument, Feldman's counsel was unable to explain why the same causal theory used in this case would not equally invalidate states' registration requirements if an expert could show that the cost of registration fell more heavily on minorities than non-minorities, and fewer were registered to vote.

For these reasons, the district court's decision not to credit this report as sufficient to prove the existence of the *Gingles* factors was not "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009).

Feldman further argues that evidence showing that minority voters change residences more often than non-minority voters, are less able to travel to different polling locations because they are less likely to own vehicles or have jobs with flexible work schedules, and face language barriers as many do not speak English should satisfy the fifth *Gingles* factor. However, the fifth *Gingles* factor reads: "the extent to which members of the minority group in the state or political subdivision *bear the effects of discrimination* in such areas as education, employment and health, which hinder their ability to participate effectively in the political process" 478 U.S. at 37 (internal quotation marks omitted) (emphasis added). The district court accepted that minority voters may be disparately

18

burdened by the limitations cited by Feldman, but properly found she had not shown that these burdens are "the effects of discrimination."[10] *Id.* Feldman's brief cites only to Dr. Lichtman's report, which the district court could properly discount for the above-discussed reasons, and a portion of Dr. Rodden's report discussing the unrelated question of voter turnout rates to prove that official discrimination caused the observed disparities. As such, it was not clearly erroneous for the district court to conclude that Feldman failed to establish that this *Gingles* factor turned in her favor.

In addition to the factors listed in *Gingles*, a court must also consider the state's interest in its electoral system, which the Supreme Court has held is "a legitimate factor to be considered by courts among the 'totality of the circumstances'" in determining whether a § 2 violation has occurred. *Houston Lawyers' Ass'n v. Attorney Gen. of Tex.,* 501 U.S. 419, 426–27 (1991). Here, the district court found that there were numerous policy considerations supporting the use of in-precinct voting requirements. Our sister circuit has also recognized that "[t]he advantages of the precinct system are significant and numerous." *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004). The

---

[10] We make no claim that the fifth *Gingles* factor requires proof of intentional discrimination, but only, as the text of *Gingles* demands, proof that the adverse socioeconomic conditions be the "effects of discrimination" and not of something else, such as recent arrival into the workforce. 478 U.S. at 37.

19

precinct system (1) "caps the number of voters attempting to vote in the same place on election day," (2) "allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies," (3) "allows each precinct ballot to list only those votes a citizen may cast, making ballots less confusing," (4) "makes it easier for election officials to monitor votes and prevent election fraud," and (5) "generally puts polling places in closer proximity to voter residences." *Id.*

As the *Gingles* factors are non-exclusive, 478 U.S. at 45, we also look to whether Arizona's precinct vote rule interacts with racial discrimination to limit minority voters' access to the political process or electoral opportunities. The limited numerical burden of the precinct vote rule (roughly seven thousand non-minority voters and four thousand minority voters, together 0.5% of overall voters) indicates that it does not practically affect minority access to electoral opportunities and the political process. The existence of widely-used and convenient alternatives to in-person voting on election day (such as early voting or vote-by-mail) further supports this conclusion.

In sum, looking at the totality of the circumstances, the relevant *Gingles* factors, the limited number of OOP ballots not counted because of Arizona's precinct vote rule, and the convenient alternatives to in-person voting on election

20

day together suggest that Feldman will likely not be successful on the second step of her VRA § 2 claim. That is because we have grave doubts both that "a searching practical evaluation" would suggest that Arizona's precinct vote rule will limit minority individuals' "opportunity to participate in the political processes," but even were such opportunity limited, that such limitation was caused by historical or present official racial discrimination. *Gingles*, 478 U.S. at 44-46. The district court's conclusions here were not clearly erroneous.[11]

[11] The dissent references numerous parts of the district court record but fails to engage with the factual sufficiency of this material nor does it recognize the deferential standard of review for a district court's factual findings. *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 591 (9th Cir. 1997). For example, the dissent points to another expert report, by Dr. David Berman, which discusses racial discrimination in Arizona history as sufficient to satisfy the first *Gingles* factor. Again, as with the Lichtman report, the conclusions of Berman's report are not unrebutted. Appellees' expert opined that Berman's description of a "linear trajectory [from] past discrimination to current legislation concerning voting…is a misuse of historical interpretation." Much of Berman's report focuses on a voting literacy test passed in Arizona in 1912 and a 1928 Arizona Supreme Court ruling limiting Native Americans' eligibility to vote in state (as opposed to national) elections, events occurring roughly one-hundred years ago. Since the 1970s the evidence of racial discrimination in Arizona cited by Dr. Berman has been notably thin, namely that Arizona had been subject to preclearance requirements (later declared unconstitutional) and had promulgated voter ID and citizenship voting laws that have later been upheld by this court or preempted by federal legislation, respectively. *See Gonzalez*, 677 F.3d at 383. Also, English-only education initiatives are often widely supported by minority voters because they want to learn English and to our view promote social inclusion by ensuring all Americans have a common means of communication and improved education. As with the Lichtman report, these inaccuracies and misstatements would offer substantial justification for the district court to disregard Berman's report.

As to the sixth *Gingles* factor, the dissent claims there was "substantial evidence" of campaigns characterized by overt or subtle racial appeals apparently on the basis of four discrete campaign statements referenced in Dr. Lichtman's problematic report over the course of the past ten years. This is thin evidence indeed.

As to the seventh *Gingles* factor, the dissent again cites Dr. Berman's report chronicling a disparity between the population of certain minority groups in Arizona and their representation in the state legislature. Even assuming these figures are accurate, they also show that Hispanic representation in the state legislature grew by nearly 40% in

(continued...)

21

IV.

**Fourteenth Amendment Claim**

The district court concluded that Arizona's precinct vote rule was constitutionally permissible under the *Anderson-Burdick* framework because it imposed a minimal burden on voting and served important regulatory and administrative interests. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

Feldman accepts the *Anderson-Burdick* framework as the proper analytical structure, but asserts that the district court did not properly credit the burden that Arizona's precinct vote rule and consequent rejection of all OOP ballots actually places on voting rights. She emphasizes that since 2012, "some 14,500 voters"

---

[11](...continued)

the past decade. Other evidence in the record shows that Arizona has roughly the same number of Hispanic legislators as California, even though California has a much larger Hispanic population. Moreover, VRA § 2 expressly provides "[t]hat nothing in this section establishes a right to have members of protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b).

Taken together, the district court appreciated the thin evidentiary basis (despite the thousands of pages submitted to the court) supporting Feldman's claim in making its factual determinations, which we review for clear error. *Salt River Project*, 109 F.3d at 591. Most importantly, a mechanical recitation of the *Gingles* factors misses the substantive analysis required by VRA § 2: which is "a searching practical evaluation" of the factual record to determine if a challenged voting regulation will limit minority individuals' "opportunity to participate in the political processes." *Gingles*, 478 U.S. at 44-46. That Arizona requires all non-minority and minority in-person voters to vote in their assigned precinct or vote center does not undermine minority access to the political process or electoral opportunities.

have had their ballots discarded because of this practice, which is substantially more (both as a proportion and absolute number) than in any other state. She stresses that Arizona's precinct vote rule, taken in conjunction with the difficulties that result from voters' confusion about polling locations due to frequent changes and erroneous public communications, together constitute a substantial burden on voting.

According to the district court's calculations, Arizona's OOP ballot policy leads to 0.5% of total votes cast not being counted at all. Beyond being a very small proportion of total votes cast, as the district court points out, the practical burden that Arizona's precinct vote rule actually imposes is nothing more than requiring voters to go to the proper polling location or vote by mail, the option on which roughly 80% of Arizona voters rely. While the dissent makes much of allegedly inconvenient in-person voting procedures and frequently changing polling locations, Feldman does not challenge these practices in this lawsuit. Moreover, it is undisputed that Arizona undertakes substantial outreach (despite isolated informational errors) to educate voters so they can arrive at the right polling place. Finally, the Supreme Court has held that substantially more demanding rules, such as requiring voters to acquire a government identification card to cast a ballot, do not meaningfully burden voting under the Fourteenth

23

Amendment. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197-200 (2008) (controlling opinion of Stevens, J.). Being required to go to the proper polling location cannot be deemed a burden on voting as this requirement is inherent to the very essence of in-person voting. *See Colo. Common Cause v. Davidson*, 2004 WL 2360485, at *14 (Colo. Dist. Ct. Oct. 18, 2004) ("[I]t does not seem to be much of an intrusion into the right to vote to expect citizens, whose judgment we trust to elect our government leaders, to be able to figure out their polling place."); *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 344 (6th Cir. 2012) (voters should not be absolved "of all responsibility for voting in the correct precinct or correct polling place by assessing voter burden solely on the basis of the outcome—i.e., the state's ballot validity determination").

Feldman asserts that the district court erred in its assessment of the burden by ignoring the fact that thousands of votes are not counted under the precinct vote rule, and that the burden on the voters casting the OOP ballots is severe because those voters are disenfranchised entirely. However, this argument ignores that every voting qualification — including voter registration, for example — will keep at least one person from casting a ballot that is counted. Under this theory, every voting qualification would be subjected to strict scrutiny, because the burden would be "severe" on at least some number of individuals, however small that

24

number might be. That result simply can't be, as the Supreme Court expressly instructed in *Burdick*. 504 U.S. at 433.

Given that the district court properly concluded that Arizona's precinct vote rule imposed a minimal burden on voting, the *Anderson-Burdick* framework does not require a searching inquiry into the justifications for this practice. *Pub. Integrity All., Inc. v. City of Tucson*, 2016 WL 4578366, at *3 (9th Cir. Sept. 2, 2016) (en banc). Arizona's precinct vote rule and resulting policy of rejecting OOP ballots makes administering a precinct voting system considerably less costly by not requiring election workers to undertake a time-consuming and uncertain process of separating eligible from ineligible votes on thousands of OOP ballots and recounting the potentially valid ones. This, in turn, makes it easier to use precinct voting systems, which have many practical advantages such as limiting polling-place wait times and reducing voter confusion by providing only ballots tailored to the persons and issues on which the voter is entitled to vote. *See Sandusky*, 387 F.3d at 569. Moreover, public knowledge that Arizona would try to identify and count valid portions of OOP ballots could conceivably lead to a substantial number of voters casting their ballots at improper polling locations if they were mostly concerned with voting in state-wide or national elections and a consequent increase in cost and delay in counting those OOP ballots (see *infra*,

25

page 26 *et seq.*).  Further, the failure to enforce the precinct vote rule will depress voting for local candidates and issues.  These reasons are sufficient to bear Arizona's burden of asserting interests that outweigh the minimal burden that the precinct vote rule imposes on voting.  The district court should be affirmed on this point.[12]

## V.

Feldman asserts that restrictions on fundamental voting rights inherently constitute irreparable harm and that the longevity of an unconstitutional practice offers no basis to deny a challenge to that practice.  Because the district court properly concluded that Feldman was unlikely to succeed on the merits of her claims, it was also correct to conclude that she would not suffer irreparable harm absent an injunction.  The district court also found that Feldman's decision to wait until decades after the establishment of Arizona's precinct vote rule also suggested she would not be irreparably harmed if an injunction did not issue.  Feldman's suggestion that she had not "delayed" referred only to her actions since filing the lawsuit in the spring of 2016, but did not address the many years this policy stood on the books before her lawsuit was filed.  Taken together, the district court's

---

[12]Although Feldman raised an Equal Protection claim to the district court, she did not challenge the district court's ruling on this question on appeal and we do not address it here.

conclusion regarding the lack of irreparable harm should an injunction not issue was not an abuse of discretion and is affirmed.

## VI.

"A plaintiff seeking a preliminary injunction must establish . . . that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, "a preliminary injunction is also appropriate when a plaintiff raises 'serious questions' as to the merits and 'the balance of hardships tips sharply in [plaintiff's] favor.'" *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 n.4 (9th Cir. 2016) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The balance of the equities and public interest preliminary injunction factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Supreme Court has affirmed that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Burdick*, 504 U.S. at 441 (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)). Nevertheless, the underlying right at stake must be tempered by the fact that only 11,000 out of more than 2 million ballots are affected by the law challenged by Feldman. Moreover, Ninth Circuit

27

precedent has found that "interference with impending elections is extraordinary...and interference with an election after voting has begun is unprecedented." *Southwest Voter Registration Educ. Project v. Shelly*, 344 F.3d 914, 919 (9th Cir. 2003); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). Along these lines, in *Gonzalez v. Arizona*, this court affirmed a denial of a preliminary injunction of a voter ID law in part because the state had "invested enormous resources in preparing to apply [the voting law]" and changing election procedures would cause confusion among election officials and voters. 485 F.3d 1041, 1051-52 (9th Cir. 2007).

The facts of the situation here are analogous. Arizona Elections Director Eric Spencer affied that instituting a new vote counting procedure "would likely delay the canvass process, and therefore likely put the counties and the state past the statutory deadlines." He also stated, "[t]he elections budgets for counties are likely already set and do not necessarily include funds to cover the additional labor and duplicate ballots that would be required to count OOP ballots." Pima County Elections Director Brad Nelson explained that partially counting OOP ballots would take "additional time, manpower, and financial resources" because counties likely would use a manual approach with four election workers similar to the method for counting damaged ballots. Nelson estimated the manual approach

28

could take up to fifteen minutes per OOP ballot. At oral argument Appellees' counsel asserted that existing automated vote counting technologies could not simply be altered to count the votes at the top (for national and state-wide offices) of OOP ballots because so doing would potentially violate state and federal laws requiring pre-use testing of all vote counting technologies. Also, if preliminary injunctive relief is granted, a greater number of voters may decide to vote outside their precinct or incorrectly believe they can vote at any location, creating further systemic costs.

These facts suggest that the district court did not abuse its discretion. The district court was clearly cognizant of the impending election and the cost that granting preliminary injunctive relief would have both for Arizona's election budgets as well as uncertainty in light of last-minute rule changes.

## VII.

The district court correctly concluded that Feldman was unlikely to succeed on the merits of her VRA or Fourteenth Amendment claims. It also properly concluded that she would not face irreparable harm if an injunction did not issue and that the balance of equities did not tip in her favor. For these reasons, the district court did not abuse its discretion in denying Feldman's motion for a preliminary injunction.

**AFFIRMED**.

*Feldman v. Sec. of State of Arizona*, No. 16-16865

THOMAS, Chief Judge, dissenting:

Voting should be easy in America. In Arizona, it is not, and the burden falls heaviest on minority voters. At issue in this appeal is Arizona's refusal to count ballots cast out-of-precinct, even for races in which the citizen is entitled, qualified, and eligible to vote. Statistically significant evidence shows that this practice disproportionately and adversely impacts minority voters. Because the district court erred in denying the motion for a preliminary injunction directing that these legitimate votes be counted, I respectfully dissent.

I

Under federal and state law, a voter who appears to vote at the wrong precinct is entitled to cast a provisional ballot. 52 U.S.C. § 21082; A.R.S. § 16-584. In Arizona, these provisional ballots are placed in a tub and taken to a voting center. There, the voters' addresses are compared with precinct geography. If a ballot was cast by a person who lives in the precinct where he or she voted, then it is counted. If the voter's address was outside the precinct, the ballot is rejected in its entirety, even as to races and ballot measures for which the voter was entitled to

-1-

cast a ballot. These races include Presidential, Senatorial, and statewide elections, and Congressional elections if the voter lives in the Congressional district.

Arizona is among the nation's leaders in the number of ballots deemed provisional. It leads the nation, by a wide margin, in the number of provisional ballots rejected, and therefore not counted. The primary reason for rejecting provisional ballots in Arizona is that they were cast out-of-precinct. The following graph illustrates Arizona's experience in comparison with that of other states:



Since 2006, Arizona has rejected over 121,000 provisional ballots cast out-

of-precinct. Of the voters visiting a polling place in Arizona in the 2012 general election, 22% were asked to cast a provisional ballot, and over 33,000 of these—more than 5% percent of all in-person ballots cast—were rejected. The provisional voting rate was 18% in 2014. No other state rejects a larger share of its in-person ballots.

Rejected out-of-precinct provisional ballots are most prevalent in the relatively urban counties, especially Maricopa and Pima. The vast majority of Arizonans live in Maricopa and Pima Counties. Indeed, Maricopa County accounts for 61% of Arizona's population and almost 70% of all out-of-precinct ballots cast.

Why is there such a high rate of out-of-precinct voting in Phoenix and Tucson? The answer largely is that are relatively few polling places in those cities, and polling sites change with great frequency. As the plaintiffs' expert put it: "Voters must invest significant effort in order to negotiate a dizzying array of precinct and polling place schemes that change from one month to the next." As one State Senator observed, it is not uncommon for a voter's assigned polling location to change nearly every election. And, significantly for our consideration, changes in polling place locations are statistically associated with higher rates of out-of-precinct voting.

The 2012 election cycle in Maricopa County provides an example. In the general mid-term election in November 2010, there were 1,143 polling places. For the Presidential Preference Primary in February 2012, there were 211. For the general 2012 election, there were 724. In 2008, 2012, and 2016, Maricopa County used a completely different precinct system for the Presidential Preference Primary than for the general election. In returning to a precinct model, the County places one polling place in each precinct. However, the number of registered voters varies widely from precinct to precinct. For example, one precinct had approximately 100 registered voters; another in the same geographic area had 9,000.

For the Presidential Preference Primary in 2016, Maricopa County used a "vote center model," in which voters can vote in any polling place in the county, with the appropriate precinct ballot being generated for each voter at the vote center. However, for the 2016 general election, Maricopa County switched back to the precinct-model system, assigning voters back to hundreds of precincts.

Geography also plays a role. Many polling places are located directly on precinct boundaries. Multiple polling places are often clustered together, sometimes even in the same building. Some of these voting places are outside the boundaries of the voter's actual precinct. Many voters cast their ballots in

incorrect precincts simply because they stood in the wrong line at a multi-precinct location.

An assigned polling place is not necessarily the poll closest to the voter's residence. In fact, in Maricopa County, one quarter of out-of-precinct voters cast ballots in an incorrect polling place that was actually closer to their home than their assigned polling place. Indeed, most out-of-precinct votes in Maricopa County are cast very close to the assigned polling place.

Causing additional confusion is the fact that the City of Phoenix conducts elections at the same time at completely different polling places. Thus, a citizen who wished to vote in person in both city and state elections would have to travel to two entirely different voting places on election day.

The reduction of the number of polling places in Phoenix has also had an impact on voting. During the last Presidential election, voters in some precincts waited four to six hours to cast their ballots. One Congressman testified that voters did not complete voting in his district until well after midnight. A State Senator testified that there was only one polling place in his district of 70,000 people. In that district, it would take a voter using public transportation 50 minutes to get to the voting booth. He testified that in West Phoenix, an area consisting of

over 200,000 people in predominantly Hispanic neighborhoods, there were only two voting centers. In his district, voters waited up to 5 hours to vote.

In addition, there were voters who were not told where their correct precinct was located when their ballots were categorized as provisional, thereby preventing them from voting at the correct precinct. One voter left the hospital to vote after undergoing heart by-pass surgery. Two polling places where he had voted previously were closed. He found a pamphlet sent to him by the county listing his polling place, went to the place indicated, and voted a provisional ballot. The election workers did not tell him that his vote would not be counted, nor did they identify his correct voting place. He returned to the hospital after voting. His vote was rejected in a race that ended up being decided by a handful of votes.

How does this complicated, kaleidoscopic method of designating polling places affect minority voting? The record is undisputed: it has a statistically significant adverse affect on minority voters.

The numbers are startling. The rate at which in-person ballots were rejected and not counted because the votes were cast out-of-precinct was 131% higher for Hispanics, 74% higher for African Americans, and 39% higher for Native Americans than for white voters.

According to the data collected by Maricopa County, many voters whose ballots were classified as having been cast in the wrong precinct did not make a mistake at all. Their ballots were marked as "out-of-precinct" and discarded even though their registration precinct matched residency records for the precinct. In other words, the citizen voted in the right place, but the voter's properly cast ballot was improperly rejected as being cast out-of-precinct.

The rate at which these ballots were rejected along ethnic and racial lines was also significant: 80% higher for Hispanics, 34% higher for African Americans, and 26% higher for Native Americans in comparison with white voters. This problem is not trivial: fully 35% of the ballots rejected as being out-of-precinct were discarded in error. And the disparity between white and non-white voters has proven consistent over time.[1]

---

[1] The majority and the district court seem to discount this effect because the plaintiffs are not challenging the precinct system per se. However, that is a red herring. Plaintiffs are challenging the effect of the system, which can easily be remedied by counting the ballots cast, rather than changing the entire precinct system.

The following graph illustrates the ethnic and racial disparity of out-of-precinct ballots cast in Maricopa County from 2010-2014:



Overall, as the district court noted, white voters accounted for 56% of the out-of-precinct ballots, despite casting 70% of all in-person votes. In contrast, Hispanic voters made up 15% of in-person voters, but accounted for 26% of out-of-precinct votes. African Americans accounted for 10% of in-person voters, but 13% of out-of-precinct votes.

Similar results occurred in Pima County for the general elections of 2010 and 2012. The rates at which African Americans and Hispanics cast

out-of-precinct ballots in Pima County were significantly higher than the rate for whites in both years. In 2012, the rate at which African American voters cast out-of-precinct ballots was 37% higher than for white voters. For Hispanics, the rate was 123% higher than for white voters. The rate was also higher in 2012 for Native American voters by 47% in comparison to white voters. Each of these differences is statistically significant. These racial and ethnic differences were also statistically significant in the 2010 mid-term general election.

This disparity also exists in rural areas. In non-metropolitan counties, out-of-precinct voting is negligible in majority-white precincts, but increases dramatically in precincts where Hispanics and Native Americans make up majorities.

Based on these facts, the plaintiffs filed suit under § 2 of the Voting Rights Act and the First and Fourteenth Amendments, alleging that Arizona's practice of discarding out-of-precinct ballots disparately burdens minorities and leaves them with less opportunity than other members of the electorate to participate in the political process. The district court denied their motion for a preliminary injunction, which brings us to the instant appeal.

## II

The district court erred in denying the motion for a preliminary injunction founded on Voting Rights Act violations.  As I noted in the companion appeal, the Voting Rights Act of 1965 "was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century."  *State of S.C. v. Katzenbach*, 383 U.S. 301, 308 (1966) a*brogated by Shelby Cty., Ala. v. Holder*, __ U.S. __, 133 S. Ct. 2612 (2013).  The Act "implemented Congress' firm intention to rid the country of racial discrimination in voting. It provided stringent new remedies against those practices which have most frequently denied citizens the right to vote on the basis of their race."  *Allen v. State Bd. of Elections*, 393 U.S. 544, 548 (1969).

The central purpose of the Act was  "[t]o enforce the fifteenth amendment to the Constitution of the United States."  *Chisom v. Roemer*, 501 U.S. 380, 383 (1991) (quoting Pub.L. 89–110, 79 Stat. 437, 42 U.S.C. § 1973 *et seq.*).  The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  U.S. Const. amend. XV, § 1.

At issue in this preliminary injunction appeal, as well as in the companion appeal, is § 2 of the Act, which is "a restatement of the Fifteenth Amendment." *Chisom*, 501 U.S. at 392. Section 2 provides, without limitation, that any voting qualification that denies citizens the right to vote in a discriminatory manner violates the Voting Rights Act. 52 U.S.C. § 10301; *see also Allen,* 393 U.S. at 566–67 (noting that Congress intentionally chose the expansive language "voting qualifications or prerequisite to voting, or standard, practice, or procedure" for § 2 so as to be "all-inclusive of any kind of practice" that might be used by states to deny citizens the right to vote (internal quotation marks omitted)). As amended in 1982, § 2 makes "clear that certain practices and procedures that *result* in the denial or abridgment of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge." *Chisom*, 501 U.S. at 383–84.

To succeed on a § 2 claim, a plaintiff must show (1) that "the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" and (2) "that burden must in part be caused by or linked to social and historical conditions that have or currently

produce discrimination against members of the protected class." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) (internal quotations omitted); *see also Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016).

A

The record of this case demonstrates that the challenged practice of refusing to count votes cast out-of-precinct for races in which the voters were eligible to participate caused minority voters "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *League of Women Voters*, 769 F.3d at 240.[2] Unlike the companion appeal, which involved a situation in which statistical evidence was not possible to obtain, this case involves hard, statistically significant proof of discriminatory effect.

The district court acknowledged this proof, and credited it for the purposes of its analysis. However, it deemed the evidence insufficient at stage one of the Voting Rights Act analysis because, in the district court's view, the rejected out-of-

---

[2] As the majority properly notes, the district court assumed, for the purposes of the motion, that expert evidence tendered by the plaintiffs was sufficient to show a cognizable disparate burden under the Voting Rights Act. The majority stated it had "grave doubts" as to this conclusion, but accepted, without deciding, that the plaintiffs carried their burden of proof. Because the first part of the § 2 analysis greatly informs the second part of the examination, it is necessary for me to discuss the proof and the district court's opinion in some detail.

precinct votes did not constitute a significant portion of the total votes cast.  In the district court's view, the plaintiffs were required to prove that the rejection of out-of-precinct ballots cast by minorities "meaningfully reduces the likelihood that minority as compared to white voters will cast ballots that are ultimately counted."

No other court in the nation has imposed such a requirement. There is no support for the district's court new requirement either in the text of the Voting Rights Act or in any case construing it.  The standard at stage one is simply that the "the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  *League of Women Voters*, 769 F.3d at 240.  The key phrases here are "burden" and "less opportunity."  The standard does not include "meaningful" or significant overall electoral impact.

A Voting Rights Act plaintiff need not show that the challenged voting practice caused a disparate impact by itself.  *Farrakhan v. Washington*, 338 F.3d 1009, 1018–19 (9th Cir. 2003).  Nor must the challenged practice make voting impossible or cause significant electoral impact.  It suffices for a violation of the Voting Rights Act that the practice simply makes voting more burdensome.

-13-

*Thornburg v. Gingles*, 478 U.S. 30, 35–36, 44, 47 (1986). And, as the Fourth

Circuit succinctly put it, "what matters for purposes of Section 2 is not how many

minority voters are being denied equal electoral opportunities, but simply that

'any' minority is being denied equal electoral opportunities." *League of Women*

*Voters*, 769 F.3d at 244. As Justice Scalia put it:

> If, for example, a county permitted voter registration for only three
> hours one day a week, and that made it more difficult for blacks to
> register than whites, blacks would have less opportunity "*to*
> *participate* in the political process" than whites, and § 2 would
> therefore be violated—even if the number of potential black voters
> was so small that they would on no hypothesis be able *to elect* their
> own candidate,

*Chisom*, 501 U.S. at 408 (Scalia, J., dissenting) (emphasis in original); *see also id.*

at 397 (Maj. Op.).

Put another way, the district court and the State are arguing that the minority

voters' claims must fail because their votes really didn't matter to the electoral

outcome. That proposition is contrary to the entire theory of the Voting Rights

Act. As the Supreme Court has observed: "No right is more precious in a free

country than that of having a voice in the election of those who make the laws

under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17

(1964).

Black votes matter.  Hispanic votes matter.  Native American votes matter.  White votes matter.  All votes matter.

And the district court and the State are wrong to assume that, because the improperly rejected votes constituted a relatively small portion of the total votes cast, those votes really didn't matter.  Arizona has had a long history of very close elections.  Indeed, earlier this year, in the Fifth Congressional District Republican primary, Andy Briggs defeated Christine Jones by 27 votes.

And the list goes on.  In the 2014 Second Congressional District, Martha McSally defeated Ron Barber by 167 votes.  The 2012 Democratic primary in the Fourth Congressional District between Johnnie Robinson and Mikel Weisser was decided by 19 votes.  Proposition 112, a 2010 statewide ballot measure seeking to shorten the filing deadline for initiative petitions, lost by 194 votes.  The 2002 Arizona Gubernatorial election was decided by slightly over 10,000 votes.  In the 1994 Democratic primary for U.S. Senate, then-Congressman Sam Coppersmith edged then-Arizona Secretary of State Dick Mahoney by 59 votes.  A 1992 Republican legislative primary election between Richard Kyle and John Gaylord resulted in a tie, with the winner being decided in a hand of poker, which Kyle won by drawing a pair of sevens over Gaylord's failed heart flush.

Indeed, the very first Arizona gubernatorial election in 1912 was very close,

and the second race for Governor in 1916 was decided by 30 votes. In sum, close elections have long been part of the fabric of Arizona politics. So votes, in fact, do matter in Arizona, and disenfranchisement of any segment of voters can have an effect on the outcome of an Arizona election.

The district court's imposition of a "meaningful electoral effect" requirement constituted legal error. For the reasons I have previously discussed, the total number of votes affected is not the relevant inquiry; the proper test is whether minority votes are burdened. If the right to vote in-person by minority voters is burdened, it is not relevant that minorities may vote by absentee ballot. In addition, it is, to say the least, ironic that the State and the district court would rely on early absentee voting in this appeal, when in the companion case, both dismissed absentee voting as a mere "convenience" because, in their view, in-person voting was the intended primary means for voters to cast their ballots.

Here, the plaintiffs established through statistically significant evidence that the practice of not counting out-of-precinct ballots for races in which the voter was qualified to vote afforded minority voters "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *League of Women Voters*, 769 F.3d at 240. Plaintiffs more than satisfied their burden as to the first part of their § 2 Voting Rights Act claim.

B

The second part of a § 2 claim requires a plaintiff to show that the burden on voting imposed by the challenged practice is "in part [ ]caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *League of Women Voters,* 769 F.3d at 240; *Veasey,* 830 F.3d at 244.

As I discussed in my dissent to the companion appeal, the Supreme Court has identified several factors to be taken into consideration, consistent with the legislative history of the Voting Rights Act, namely:

> (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

> (2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

> (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

> (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

> (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals; and

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 37.  In addition, the Court added that in some cases, there was probative value in inquiring "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" and "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Id.* (citing S. Rep., at 28–29, U.S.Code Cong. & Admin. News 1982, pp. 206–207).

Without repeating in detail the evidence tendered by the plaintiffs as to the *Gingles* factors that I discussed in my prior dissent, *Feldman v. Arizona Sec'y of State*,  2016 WL 6427146, at *29–31 (9th Cir. 2016), it is clear that they satisfied their burden.

As to the first factor, the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process, the plaintiffs produced expert testimony through Dr. David R. Berman of Arizona State University.   He detailed Arizona's long history of imposing burdens

on minority voters. In 1912, shortly after gaining statehood, Arizona imposed a literacy test for voting. In Cochise and Pima Counties, the denial of the right to vote meant that nearly half the precincts lacked enough voters to justify holding primary elections in 1912. From 1912 to the early 1960s, election registrars applied the literacy test to reduce the ability of African Americans, Native Americans, and Hispanics to register to vote. In an action filed against Arizona to enforce the Voting Rights Act, the United States Justice Department estimated that 73,000 people could not vote because of the existence of the literacy test.

The passage of the Voting Rights Act in 1965 caused the suspension of the literacy test in Arizona, but the statute remained in effect until it was repealed in 1972, after Congress banned its use in 1970 through an amendment to the Voting Rights Act. Arizona subsequently unsuccessfully challenged the Congressional ban on literacy tests. *Oregon v. Mitchell*, 400 U.S. 112, 118 (1970). In *Mitchell*, the Court noted that, in Arizona, only two counties out of eight with Hispanic populations in excess of 15% showed voter registration equal to the state-wide average. *Id.* at 132. In the 1960s, there were a number of initiatives to discourage minority voting in Arizona, such as "Operation Eagle Eye." Under Operation Eagle Eye, minority voters were challenged at the pools on a variety of pretexts,

with the goal of preventing minority voting or slowing down the process to create long lines at the polls and discourage voting.

Native Americans in Arizona especially suffered from voting restrictions. Although Native Americans were U.S. citizens, the Arizona Supreme Court held in 1928 that they could not vote because they were under federal guardianship. *Porter v. Hall*, 271 P. 411, 419 (Ariz. 1928). Even after that ban was overruled in 1948 in *Harrison v. Laveen*, 196 P.2d 456 (Ariz. 1948), Native Americans faced significant obstacles to voting. *See generally*, Patty Ferguson-Bohnee, *The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter Suppression*, 47 Ariz. St. L. J. 1099, 1112 (2015).

Because of its long history of imposing burdens on minority voting, Arizona became one of nine states subject to the pre-clearance requirements of the Voting Rights Act after it was amended in 1975 to protect language minorities. 40 Fed. Reg. 43746. Under the pre-clearance provision, Arizona was required to obtain the approval of the United States Department of Justice before implementing any law affecting the voting rights and representations of minorities. Since 1982, the Department of Justice has vetoed four statewide redistricting plans proposed by Arizona that appeared to discriminate against minorities. As Dr. Berman testified: "Arizona has a long history of discrimination against Native Americans, Hispanics

and African Americans when it comes to their voting rights. This discrimination has been reflected in legislation relating to voter requirements, election law and the manner in which elections have been administered, efforts to intimidate voters, and instances of racial appeals, both subtle and not so subtle during campaigns." He testified that "[l]ooking at the history of abuse and neglect, there is no reason to assume that discrimination in regard to voting and election practices is a relic of the past and that the protections provided by preclearance are not needed in Arizona."

As to the second factor, the extent to which voting in the elections of the state or political subdivision is racially polarized, Dr. Allan Lichtman of American University provided expert testimony detailing the history of polarized voting in Arizona. Statistical analysis showed the sharp polarization between white and non-white voters. Indeed, the data showed that for every election studied, the preferences of white and non-white voters diverged significantly.

For the reasons described in both the discussion of the first *Gingles* factor and in stage one of the Voting Rights Act analysis, plaintiffs demonstrated a likelihood of success as to *Gingles* factor three: Arizona has used voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

Because the voting access issues affect the right to vote for a candidate, the fourth factor concerning the candidate slating process is not relevant, and the plaintiffs' expert conceded that there did not seem to be candidate slating by political parties in recent Arizona history.

The fifth factor, which I shall discuss in more detail later, the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process, falls decisively in favor of the plaintiffs. The plaintiffs' expert opined that "[t]he persistent effects of discrimination are substantially demonstrated in the deficient socio-economic position of Hispanic, Native American, and African American people in Arizona." The plaintiffs tendered significant evidence showing that Arizona minorities suffered in education and employment opportunities, with disparate poverty rates, depressed wages, higher levels of unemployment, lower educational attainment, less access to transportation, residential transiency, and poorer health.

The plaintiffs also provided substantial evidence as to the sixth factor, namely, whether political campaigns have been characterized by overt or subtle racial appeals.

Finally, the plaintiffs provided evidence supporting the seventh *Gingles* factor, namely, the extent to which members of the minority group have been elected to public office in the jurisdiction. As of January 2016, Hispanics constituted over 30% of the population, but held only 19% of the seats in the Arizona legislature. African-Americans made up 4.7% of the population, but held 1% of the legislative seats. Native Americans fared slightly better, constituting 5.3% of the population and holding 4.4% of the legislative seats.

In sum, the plaintiffs tendered significant, and mostly uncontradicted evidence, satisfying the *Gingles* factors at stage two. But, again, the *Gingles* factors are not the end of the story. We are obligated to look to the "totality of the circumstances." 52 U.S.C. § 10301(b). When we do so, we can easily see how the effects of discrimination hinder minority voters' ability to cast ballots in person. And in assessing the totality of the circumstances, we also must be mindful that the Voting Rights Act does not require proof of intentional discrimination; indeed, Congress specifically amended § 2 of the Voting Rights Act in 1982 to relieve plaintiffs of the burden of proving discriminatory intent. *Chisom*, 501 U.S. at 394; *see also Ruiz v. City of Santa Maria,* 160 F.3d 543, 557 (9th Cir. 1998) (noting Congress's statement that the "intent test" was "unnecessarily divisive in that it involved charges of racism on the part of individual officials or entire communities

-23-

[and] placed an inordinately difficult burden of proof on plaintiffs and [ ] asked the wrong question" (internal alterations and quotation marks omitted)).  Rather, courts must consider how the challenged practice "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles,* 478 U.S. at 47.  And proof of direct causation is not required; it suffices that the challenged practice be "linked" "in part" to social and historic conditions.  *League of Women Voters,* 769 F.3d at 240; *Veasey*, 830 F.3d at 244.

As to the issues raised in this appeal, the fifth *Gingles* factor is especially relevant, namely "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process."  478 U.S. at 37.  The district court recognized that the plaintiffs had established this factor, stating that it "did not discount Arizona's history of racial discrimination or the lingering effects on the socio-economic status of minorities."

The majority seems to require, and the district court implied, that the fifth *Gingles* factor requires proof that intentional discrimination caused minorities adverse socioeconomic effects.  However, that is not the proof required.  Our

-24-

Circuit has considered the factor satisfied when there was a history of discrimination and lowered socioeconomic status. *See, e.g., United States v. Blaine County, Montana*, 363 F.3d 897, 914 (9th Circ. 2004) (holding factor satisfied when there was evidence of lowered minority socioeconomic status and historical evidence of discrimination); *Old Person v. Cooney*, 230 F.3d 1113, 1129 (9th Cir. 2000) (factor satisfied with showing that American Indians have a lower socio-economic status than whites in Montana and that social and economic factors hinder the ability of American Indians in Montana to participate fully in the political process); *see also League of Women Voters*, 760 F.3d at 235 (employing a similar analysis). Thus, any contrary conclusion is legally erroneous.

The plaintiffs tendered significant evidence showing that Arizona minorities suffered in education and employment opportunities, with disparate poverty rates, depressed wages, higher levels of unemployment, lower educational attainment, less access to transportation, more residential transiency, and poorer health. The district court seemed to doubt that these factors were related to lower out-of-precinct voting by minorities, but the record speaks otherwise. These factors directly contribute to the statistically significant disparity in out-of-precinct voting by minorities as compared to whites. Indeed, these considerations go to the heart

of why Arizona's refusal to count legitimate out-of-precinct votes most severely affects Arizona's minority voters.

For instance, minority voters often cannot afford home ownership and they have higher rates of residential mobility than white voters. Because of this, and given the "dizzying array" of changes in polling location, minority voters are more likely to vote in the wrong precinct. Indeed, African American and Hispanic voters are substantially more affected by polling place changes than white voters. In particular, the impact of precinct consolidation, while statistically significant for all groups, is more than twice as large for Hispanics and African Americans as for non-Hispanic whites.

Data also indicates that significant numbers of Hispanic and African American voters in Phoenix do not have access to an automobile. Reliance on public transportation disparately burdens minority voters in several ways. Among voters who are transported to the incorrect polling place, minority voters have less opportunity to travel to the correct polling place. Travel distances also vary significantly between white and minority voters. The data shows that minority voters have to travel much farther than white voters to get to assigned polling places. Hispanics and Native Americans are more likely than whites to live further from their assigned polling places, and Hispanics are more likely to live in

proximity to multiple polling places to which they are not assigned. One Congressman serving a district that was 65% Hispanic testified that it took an hour and a half for his constituents to get to the polls via public transportation. And many voting centers are not located near public transportation lines. These are factors considered significant by the Fourth Circuit, in its consideration of out-of-precinct voting in *League of Women Voters*, 769 F.3d at 233–34.

In addition, in Maricopa County, there are significantly fewer polling places in Hispanic areas, using population density as a metric, than in predominantly white neighborhoods. Election day issues in these consolidated polling places, such as long delays in access to voting, disproportionately affect low-income minority voters, who typically have very little flexibility in their work day, and must vote during a narrow window of time in the morning or evening. In his study of the 2008 and 2012 elections, Dr. Lichtman concluded that minorities were 61% more likely than whites to experience waiting times of 31 minutes or more. The difference was statistically significant.

Language barriers also pose significant hindrances to minority voters who are not fluent in English. The Plaintiffs tendered evidence that voters in Spanish-speaking areas in Maricopa County received mistranslated or incorrect information from election offices, creating confusion for voters who are not fluent in English.

In the 2012 election, Maricopa County sent Spanish-speaking documents with the wrong election date to Hispanic voters. The English version contained the correct information. In a special election this year, over 1.3 million Spanish-speaking households received a ballot with erroneous descriptions of ballot initiatives.

There is an additional consequence of all these hindrances to voting: suppression of voter turnout. The plaintiffs' expert used the term "calculus of voting," to describe the overall effect on voter turnout when the barriers to voting exceed the benefits. He noted that "recent research has demonstrated that changes in polling locations associated with precinct consolidation have a substantial effect on turnout." Data showed that in Maricopa and Pima Counties, such changes were far more likely to affect minority voters as compared with white voters. Arizona has the second worst turnout of African American voters in the nation. Turnout among African Americans in Arizona's 2012 Presidential election was 46%; the national average was 66%. The turnout of Hispanic voters in Arizona was 39%, compared with a 62% turnout of white voters.

In summary, these historic and socio-economic *Gingle* factors are significantly associated with the statistically significant difference in white versus minority out-of-precinct voting. At stage two, the plaintiffs were required only to show that, under the totality of the circumstances, the discriminatory impact of the

challenged practice was linked to historic and social factors. They satisfied this burden.

C

Given the plaintiffs' uncontested proof of the undue burden imposed on out-of-precinct minority voters who were eligible to vote in some races, and the proof of association between this burden and discriminatory historical and socioeconomic factors, the district court erred in denying a preliminary injunction.

The district court also erred in its analysis of the plaintiffs' Fourteenth Amendment claims. Under *Burdick v. Takushi*, 504 U.S. 428 (1992) and *Anderson v. Celebrezze*, 460 U.S. 780 (1983), we must weigh the nature and magnitude of the burden imposed by the law against the state's interest and justification for it. *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008).

The practices challenged under *Anderson-Burdick* are evaluated from the vantage point of the burdened voters. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 186 (2008). The burden in this case is disenfranchisement. It is uncontested that Arizona has disenfranchised a significant number of minority voters, some erroneously, by virtue of its prohibition on out-of-precinct voting, even when legitimate ballots were cast. Their legitimate votes were not counted.

Restrictions on fundamental voting rights cause irreparable injury. *League of Women Voters*, 769 F.3d at 247. "[O]nce the election occurs, there can be no do-over and no redress." *Id.* Thus, "the injury to these voters is real and completely irreparable." *Id.*

The State's justification for the challenged practice is not specific to the challenged practice. The State cites "significant and numerous" advantages attending a precinct-based voting system. The purported advantages of such a system—such as capping the number of voters attempting to vote in one place on election day and putting polling places closer to voter residences—are belied by the voters' experiences. But more importantly, these justifications speak only to Arizona's choice to use a precinct-based system; they do not justify Arizona's choice to discount ballots cast out of precinct, even when the ballots contain votes the voters were eligible to cast.

Under the proper "balancing and means-end fit framework," we must "tak[e] into consideration the extent to which [the state's] interests make it necessary to burden the plaintiff's rights." *Pub. Integrity All., Inc. v. City of Tucson*, 2016 WL 4578366, at *3 (9th Cir. 2016) (internal quotations omitted). The State's articulated interest here is administrative efficiency. The State argues that it will take up to 15 minutes to process legitimate out-of-precinct votes. But in Maricopa

County, voters were waiting for between 4 to 6 hours to cast their ballots. The evidence showed that many voters who ended up voting in the wrong precinct traveled there using public transportation and may have had to take time off work. Spending a few minutes of administrative time to permit these citizens' votes to be counted pales in comparison with the sacrifice made by these voters in pursuit of the exercise of their franchise.

Perhaps more importantly, the requested relief does not involve altering pre-election or election day procedures. Voters still must vote in their precincts if their votes are to be counted as to precinct-specific contests. If a voter casts a ballot in the wrong precinct, it would still be treated as a provisional ballot. The only difference would be that the out-of-precinct vote would be counted as to those elections in which the voter was eligible to vote regardless of precinct.

In addition, when one analyzes how provisional ballots are treated, the burdens are relatively low for the State. It already manually examines the provisional ballots and manually compares addresses. If the ballot is cast in the correct precinct, it is counted. If not, the only additional burden that would be imposed would be to count the votes for the race for which the voter is qualified and eligible to vote. Arizona law provides the State ten days to count provisional ballots. The State is already using manual procedures as to write-in and damaged

ballots. These administrative burdens should not be discounted, but in comparison to the hardships faced by minority voters on election day, the scales weigh in favor of the voters.

The State's interest in administrative efficiency simply does not justify the means employed: disenfranchisement of out of precinct voters. The plaintiffs were entitled to a preliminary injunction on their Fourteenth Amendment claim.

To be sure, courts must exercise great caution in deciding election challenges close to election day. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). But the relief sought by the plaintiffs does not affect polling procedure; the plaintiffs simply seek to have legitimately cast ballots, which have already been properly collected, counted. And the lynchpin of the district court's analysis, and relied upon by the majority, is that there are not a substantial number of ballots at issue relative to the entire number of votes cast.

IV

The district court should have granted a preliminary injunction. The plaintiffs showed a statistically significant relationship between Arizona's practice of declining to count legitimate out-of-precinct votes and a disparate burden on the franchise of minority voters. The district court erred as a matter of law in requiring that the practice have a "meaningful" impact on election results. The plaintiffs

-32-

established a likelihood of success on both their Voting Rights Act and Constitutional claims. Their ballots should be counted in all races in which they are eligible to vote.

For these reasons, I respectfully dissent.